## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## TRACY SCOTT STARR,
*Defendant-Appellant.*

Lane County Circuit Court
201210792; A152960

344 P3d 100

Zachary Lovett Mazer, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before DeVore, Presiding Judge, and Ortega, Judge, and Garrett, Judge.*

DEVORE, P. J.

---

* Ortega, J., *vice* Haselton, C. J.

**DEVORE, P. J.**

Defendant appeals a judgment of conviction for attempted first-degree assault, ORS 163.185 and ORS 161.405, unlawful use of a weapon, ORS 166.220, menacing, ORS 163.190, and fourth-degree assault constituting domestic violence, ORS 163.160. The issue in this case is whether the victim's hearsay statements were admissible at trial. Defendant assigns error to the trial court's rulings that admitted the victim's statements during a 9-1-1 call as well as her statements to responding officers. He argues that admission of those statements violated his rights to confront a witness under the state and federal constitutions. We decline to review as plain error defendant's unpreserved assignment of error as to merger of guilty verdicts. We affirm.

## I.  FACTS

The police account of this case began with the victim's 9-1-1 call from a motel. The call lasted less than 30 seconds. The victim said, "I'm at the Motel 6, one—room 137. My husband pushed me down. I've been assaulted." Officer DelCastillo, a cover officer, was the first to arrive and did so within minutes of the 9-1-1 call. He found the victim sitting on a bench, sobbing and holding a rag to her bloodied face. He noticed bruising beginning to form around her eye and blood in her hair. Without pressing for any details, he asked, "What happened?" The victim told him that "her boyfriend had beat[en] her up." DelCastillo "got on the radio" and said that the victim had been assaulted. Officer Clough arrived at the motel about five minutes after the 9-1-1 call. She was the primary officer on the scene. Clough saw a laceration and bruising under the victim's left eye and blood in her hair on both sides of her head. The victim was still crying, shook a bit, and "seemed frightened." Clough asked the victim to tell her what happened. In trial testimony, Clough recounted the victim's answer:

> "She told me that she had been in a dispute with her husband and it started as a verbal dispute but then he pushed her and she fell against the cement and hit her face on a—a curbing, like a headstone to a parking space."

At that point, Clough asked the victim what defendant looked like and she used her radio to relay the description of

defendant to officers in the area in order to begin a search for him. About five or 10 minutes later, another officer found defendant in the parking lot near his truck at the other side of the motel. He was visibly intoxicated.

While at the scene, the victim gave Clough additional information. The victim told Clough that, prior to the assault, the victim and defendant had been kicked out of a bar due to a racial remark to other bar patrons. She also told Clough that she "had just moved back to the area" and did not have a permanent address. The telephone number that the victim provided Clough for contact purposes was only a "message phone number."[1]

A witness's account of the incident begins earlier than the police account. Murphy had been outside of his motel room with a small group of people on the upstairs balcony overlooking the parking lot. As something got Murphy's attention, he looked below to see the victim "slumped down on the ground." He saw her get up while defendant stood over her, go into a motel room with defendant for a few minutes, then run out toward the main exit. Murphy asked the victim if she was all right. She said that she was not and continued running away with defendant "coming out after her." Murphy asked defendant whether he had hit the victim, and, according to Murphy, defendant replied that he had, and then threatened the group standing upstairs. Murphy told defendant that the police were on their way and that defendant needed to wait. Murphy went downstairs and walked toward defendant. Defendant went to his truck, pulled out a metal pipe, raised it above his head, and swung it at Murphy. Murphy took the pipe from defendant and subdued him with help from members of the group until the police arrived. Clough arrested defendant. He was charged with fourth-degree assault constituting domestic violence, menacing, unlawful use of a weapon, and attempted first-degree assault.

Defendant offered a conflicting version of the facts at trial. He testified that he and the victim had gone out

---

[1] Clough explained at trial that a "message phone number" means a number that belonged to someone else, in this case a family member, because the victim did not have her own phone.

celebrating and drinking because they were "getting back together" and, upon arriving back at the motel, the victim fell while getting out of the truck and hit her face on the truck's door. According to defendant, he went to help the victim off the ground, at which point the group of people on the balcony, above, began shouting, and defendant told them that he was attempting to "help [his] wife." Defendant said that a few of the men came at him, that he used the truck door as a shield, and that a jack handle fell out of the door and rolled in the parking lot.

## II. PROCEEDINGS

The state moved to postpone a trial date that was set for July 19, 2012. The prosecutor indicated that the state could not find the victim, efforts to contact her were unsuccessful because calls went "straight to answering," the victim had not returned calls, the victim's family did not have contact with her or know where she was, and the victim had failed to check in at her hotel. The trial was postponed until August 21, but the victim still did not appear. Defendant moved *in limine* to exclude the victim's statements during the 9-1-1 call and her statements to DelCastillo and Clough. The state sought to admit her statements under OEC 804(1)(e), permitting the admission of hearsay statements of an unavailable declarant where the declarant is absent from the hearing and the proponent of the declarant's statement has been unable to procure attendance through process or other reasonable means. Defendant argued, among other things, that the state had failed to demonstrate that the victim was unavailable for trial, because the state had not made an attempt to locate her. Defendant objected that the victim's statements to the officers were testimonial and that admitting them would violate her constitutional confrontation rights.

To demonstrate the victim's unavailability as a witness for trial, the state presented evidence of the difficulties and its efforts from the beginning to the time of trial. The victim had not provided an address at the time of the incident, because she had recently moved and did not have a permanent address. Later, when Clough had called the victim to get an address, the victim told Clough that she was in Idaho and that she was unwilling to come back to Oregon to testify.

Silano, the director of Victim Services at the district attorney's office, testified to additional multiple attempts to contact the victim in the weeks before trial:

"[O]n June 4, 2012, * * * the advocate assigned to the case called a phone number that was listed in our database, and it was a wrong number. And she did so because the victim did not show up at grand jury * * *. On June 25, 2012, * * * the prosecuting attorney spoke to the victim.

"* * * * *

"The victim had called [the prosecutor] twice. She was in California, and she wanted to keep her address confidential from * * * defendant.

"* * * * *

"[On] July 2nd, 2012, [the advocate] had contact with the victim. She spoke to the victim. [The victim] gave * * * her new address in California, and * * * reported that she was going to the doctor regarding her tooth and damage to [her] eye socket. Told her I was mailing info, including crime victim compensation, and [the advocate] notified her of the July 5th 35-day call date.

"* * * * *

"[O]n July 2, 2012, * * * the advocate assigned to the case then went and mailed the intro information, crime victim compensation, and a brochure * * *."
•

The information mailed to the victim on July 2 was not returned as undeliverable.

Silano testified that the state had made arrangements for the victim to attend on the original trial date. The state had provided per diem payment for meals and mileage for travel from California. Hotel arrangements had also been made for the victim. When the state learned that the victim had not checked into her hotel on July 19, several more attempts were made to reach her by phone. The prosecutor left a final voicemail for the victim on August 10, 2012. The victim did not return the call by the date of trial.

Additionally, Silano and Clough testified that, at some point, the state had attempted to serve a subpoena on the victim at the California address that the victim had

supplied on July 2. When the police attempted to serve the subpoena, a relative said that the victim had since moved and provided the name of "a city" where she was living, without any street address.[2]

The trial court concluded that the victim was unavailable, because the state had attempted to serve a subpoena, the victim had moved, and the state had only the name of a city where she might be found. The court ruled that the victim's statements were excited utterances and nontestimonial.

On appeal, defendant reasserts his argument that the evidence of the victim's statements on the 9-1-1 recording and to the responding officers were inadmissible hearsay. He first contends that, under a state constitutional analysis, the state did not prove that the victim was "unavailable" as required by Article I, section 11, of the Oregon Constitution, and, therefore, all of the victim's statements during the 9-1-1 call and to the responding officers should have been excluded. Second, he argues that, for purposes of a federal constitutional analysis, the victim's statements to the officers were testimonial and should have been excluded.

The state concedes that the victim's statements regarding defendant's racial statement at the bar were testimonial and should not have been admitted, but the state argues that the admission of that evidence was harmless error. As to the victim's statement on the 9-1-1 call and her other statements to the officers, the state contends that the court did not err in admitting them, because those statements were nontestimonial and because the state satisfied the unavailability requirement.

### III. UNAVAILABLE WITNESS

We begin our inquiry under Article I, section 11.[3] *See State v. Cook*, 340 Or 530, 536, 135 P3d 260 (2006) (we begin with statutory claims, if any, followed by a defen-

___

[2] The record does not resolve the date of the attempt to execute the subpoena or the name or location of the city where the relatives believed the victim was staying.

[3] Article I, section 11, provides in part, "In all criminal prosecutions, the accused shall have the right to * * * meet the witnesses face to face[.]"

dant's state constitutional claims, and lastly a defendant's federal constitutional claims). To determine whether the admission of out-of-court statements of an absent declarant violates a defendant's state confrontation clause rights, we apply the two-part test announced and applied in *Ohio v. Roberts*, 448 US 56, 65-66, 100 S Ct 2531, 65 L Ed 2d 597 (1980). *State v. Nielsen*, 316 Or 611, 622-23, 853 P2d 256 (1991); *Cook*, 340 Or at 540 ("Although the United States Supreme Court no longer adheres to the *Roberts* test * * * we continue to use it to analyze Confrontation Clause claims under Article I, section 11 * * *."). Under that test for statements to be admissible, the declarant must be unavailable and the hearsay statements must have adequate indicia of reliability. *See State v. Stevens*, 311 Or 119, 140-41, 806 P2d 92 (1991). "When the statement falls within a 'firmly rooted hearsay exception,' courts will deem it to be reliable." *Id.* (quoting *Roberts*, 448 US at 66). In this case, defendant does not challenge the trial court's conclusion that the victim's statements were excited utterances, and, as a consequence, does not argue that the victim's statements lacked adequate indicia of reliability. Thus, the sole issue is the victim's unavailability.

The state bears the burden of proof, as the proponent of the evidence, that the witness was unavailable. *State v. Birchfield*, 342 Or 624, 630, 157 P3d 216 (2007). A claim that the witness is unavailable requires a showing that the state "made a good-faith effort to obtain [the witness's] testimony, but was unable to do so." *Nielsen*, 316 Or at 623. "If witnesses cannot be located, obviously they are unavailable. The issue becomes whether the state has made a good faith effort to find them. The degree of effort which constitutes due diligence in attempting to secure an unavailable witness depends upon the particular circumstances presented by each case." *State v. Anderson*, 42 Or App 29, 32, 599 P2d 1225, *rev den*, 288 Or 1 (1979), *cert den*, 446 US 920 (1980). We look to all of the circumstances shown in the record regarding the state's efforts to procure the victim's testimony. We "view the record in the manner most consistent with the ruling, accepting reasonable inferences and reasonable credibility choices that the court could have made in support of its ruling." *Nielsen*, 316 Or at 618. As we will

explain, we conclude that the trial court did not err in determining that the victim was unavailable.

Two cases help frame the state's good faith efforts in this case. First, in *Anderson*, we considered the unavailability of witnesses for the purposes of Article I, section 11, and concluded that the record supported a "finding that a diligent effort was made to secure the missing witnesses' attendance." *Anderson*, 42 Or App at 32. The four witnesses were all described as transient, were known to frequently travel, and "were reluctant to deal with the authorities[.]" *Id.* at 32, 33. None of the witnesses had a permanent address, and the state could not find forwarding addresses. The first witness had "maintained several local addresses in the Grants Pass area." *Id.* at 32. The state's effort to serve a subpoena twice failed, and several of the witness's friends said that "they had not seen [the witness] for some time." *Id.* The other three witnesses were only known to have "a semi-permanent residence in a cabin in the hills outside Grants Pass." *Id.* at 33. The state attempted unsuccessfully to serve a subpoena at that address and was unable to reach one of the witnesses through her inactive post office box. *Id.* We recounted that, after speaking to people living in the surrounding area, "[t]he only lead the deputies uncovered was that the four witnesses reportedly had moved approximately two months earlier and had 'possibly gone someplace into the Los Angeles area.'" *Id.* One of the witnesses was believed to have gone "'back east somewhere.'" *Id.* Calling the district attorney's office in Los Angeles did not result in any further information. We observed that the witnesses' attitudes and lifestyles made their presence harder to obtain. *Id.* By the time of trial, the state's ability to reach the witnesses had reached a dead end.

In *State v. George*, 146 Or App 449, 934 P2d 474 (1997), we addressed a similar argument in the context of admission of an unavailable witness's statement against interest pursuant to the Oregon Evidence Code.[4] OEC 804(3)(c).

---

[4] We observed that "'[u]navailability' under OEC 804 is not necessarily the same as under the confrontation [clause] of Article I, section 11," and declined to determine how the inquiries as per each might differ. *Id.* at 453 n 2. Nevertheless, as this court has also observed, "the respective inquiries undoubtedly overlap to some degree[.]" *State v. Simmons*, 241 Or App 439, 449 n 6, 250 P3d 431 (2011).

In that case, the witness, the codefendant in the defendant's trial, was released after he posted a $7,000 security deposit but then failed to appear in court. *Id.* at 451. In an effort to locate him, the state checked the witness's work and home addresses and determined that he had been fired from his job nine weeks earlier and had moved away without providing a true forwarding address. *Id.* at 453. Although a bench warrant had been issued for the witness's arrest, he had not been found before the defendant's trial. An investigator for the district attorney's office testified that "when a person 'jumps bail' of the amount involved [in that case], is not working and cannot be located in one day, then he 'may not even be in the area.'" *Id.* at 451. We concluded that evidence in the record supported the trial court's determination that the witness was not available and that the trial court did not err in admitting the witness's declaration. *Id.* at 453. We observed that the investigator had reasonably concluded that the witness had fled the area and that, where further investigation would have been futile, further investigation was not necessary to meet a good faith effort standard. *Id.*

The record in this case demonstrates that the victim's attitude and lifestyle made her presence much harder to obtain. As in *Anderson*, the victim was prone to impermanency. She moved multiple times within a matter of months. She told Clough that she did not want to travel from Idaho to attend proceedings in Oregon. She did not appear to maintain any permanent address, and she failed to return several of the state's phone calls. Based on those facts, the trial court could reasonably infer that the victim knew that the state was attempting to contact her about defendant's trial but did not wish to be found.

In the face of those difficulties, the record reveals a variety of attempts to contact the out-of-state victim by phone and by mail, as well as an attempt to serve a subpoena on the victim at her last known address. *See State v. Smyth*, 286 Or 293, 299, 593 P2d 1166 (1979) (observing that the state must attempt to compel an out-of-state witness to

Although the "contours" of the analyses may depart, an illustration of the facts present in *George* is helpful to our examination of the state's good faith efforts in this case.

attend trial). There were two calls with the victim prior to the first trial date. There were additional efforts to speak with the victim by phone between June 4 and August 10, despite the fact that the state only had a message phone number by which to reach the victim. The state mailed pretrial materials, made and communicated plans for her to attend the first trial date at the state's expense, and arranged hotel accommodations on her behalf. Significantly, the state spoke with the victim's relatives, but the relatives did not or would not provide information that revealed the victim's whereabouts. The trial court could reasonably infer that the state's efforts had reached a dead end.[5]

Therefore, the facts of this case, when viewed in their entirety, do not suggest that the state "acted with casual indifference, waited until the last minute to begin the search, or made a half-hearted perfunctory attempt" at procuring the witness. *Anderson*, 42 Or App at 34 (internal citations omitted). Given the totality of the circumstances and all reasonable inferences available from the record, we conclude that the trial court did not violate defendant's Article I, section 11, rights by admitting the victim's statements pursuant to OEC 804(1)(e).

## IV.  TESTIMONIAL AND NONTESTIMONIAL STATEMENTS

We turn to defendant's argument under the Sixth Amendment, challenging the admission of the victim's statements to the responding officers.[6] The Confrontation Clause prohibits the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 US 36, 53-54, 124 S Ct 1354, 158 L Ed 2d 177 (2004). The admission of an absent witness's "testimonial" hearsay violates a defendant's Sixth Amendment Confrontation Clause rights.

---

[5] Our opinion should not be read to relieve the proponent of an absent witness's statements from the burden to pursue non-futile leads. *Anderson*, 42 Or App at 34.

[6] The Sixth Amendment to the United States Constitution provides, in part, that "the accused shall enjoy the right *** to be confronted with the witnesses against him[.]"

We review for legal error whether an out-of-court statement is "testimonial" for the purposes of the Sixth Amendment to the United States Constitution. *State v. Camarena*, 344 Or 28, 176 P3d 380 (2008) (applying that standard).

The Supreme Court of the United States clarified the distinction between statements that are testimonial and nontestimonial in a combined decision in a pair of cases, *Davis v. Washington/Hammon v. Indiana*, 547 US 813, 126 S Ct 2266, 165 L Ed 2d 224 (2006). In the opinion on those two cases, the United States Supreme Court held:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

*Id.* at 822. Both cases involved domestic violence, and their comparison illustrated how circumstances may distinguish which statements are testimonial or nontestimonial.

In *Davis*, a 9-1-1 operator spoke with the victim, who reported Davis was "'jumping on [her] again'" and "'usin' his fists.'" *Id.* at 817. In response to the operator, the victim gave the defendant's name. Before the call ended, she said that he had left. The Supreme Court concluded that the victim's statements were necessary to enable the police to resolve a present emergency, including the need to identify the assailant so that the police might know whether they might encounter a violent suspect. As such, the statements were nontestimonial.[7]

---

[7] A number of the circumstances in *Davis* helped distinguish the 9-1-1 call as non-testimonial: (1) the statements were relatively contemporaneous with the threatening event, (2) the witness was under the stress of the physical threat, rather than calmly relating historic events, (3) the statements were necessary to help police resolve a potential emergency, including identification of the assailant, and (4) the statements were given informally in the urgency of a crime scene, rather than formally in a recorded statement in a station house. *Davis*, 547 US at 827. *See also Camarena*, 344 Or at 34-35; *State v. Graves*, 224 Or App 157, 197 P3d 74 (2008), *rev den*, 346 Or 213 (2009) (assailant had departed and the witness, although not the victim, was a frightened 14-year-old boy).

In *Hammon*, the police responded to a report of a domestic disturbance to find the wife on a porch, somewhat frightened but saying that "'nothing was the matter.'" *Id.* at 819. Her husband was in the kitchen and was kept isolated there by an officer, while another officer interviewed the wife in the living room and solicited a battery affidavit. The court concluded that the wife's statements were "neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation[.]" *Id.* at 832. Her statements were testimonial and inadmissible.

More recently, the Oregon Supreme Court addressed statements that are nontestimonial, testimonial, and a matter of harmless error. Harmless error will prove most important to our case at hand. In *Camarena*, a 9-1-1 operator had spoken with a victim of domestic violence. 344 Or at 28. When asked if there was a problem, she replied, "'Yeah, my boyfriend hit me but then he left.'" *Id.* at 30. The operator inquired about her address, in what kind of car the boyfriend had left, where he had hit her, his racial or ethnic appearance, and his name. The initial answers were all held to be admissible, nontestimonial statements. *Id.* at 41. Even if the assailant had just left, he might have returned. The statements were "necessary to help terminate that ongoing emergency." *Id.* The 9-1-1 call, however, had continued on. The victim also said that the defendant was on probation for hitting her before. When police arrived at the apartment, she recounted the events of the evening to an officer. Five days later, a detective conducted a follow-up interview with the victim, in which she reported that the defendant had struck her in the eye. The court characterized the latter 9-1-1 comment about prior criminal history to be relevant only to a subsequent criminal action and, thus, inadmissibly testimonial. *Id.* The state conceded the later interviews were testimonial, but contended that the statements were "harmlessly cumulative." The court concurred, explaining,

> "[w]e agree with that assessment. Although the remainder of the complainant's 9-1-1 responses and the complainant's subsequent statements to police officers were testimonial, we conclude that their admission at trial was harmless.

That is so because the 9-1-1 statements that were nontestimonial, and therefore admissible, were of similar content and sufficient to establish the elements of the charge against defendant."

*Id.* at 41-42. The judgment of conviction was affirmed. *Id.* at 42.

In this case, the state contends that the initial statements that the victim made to Officers DelCastillo and Clough were nontestimonial. Arriving a few minutes after the 9-1-1 call, DelCastillo found the victim no longer in defendant's immediate presence. He asked, "What happened?" The victim said that "her boyfriend had beat her up." Arriving about five minutes after the 9-1-1 call, Clough had likewise asked the victim what happened. The victim said that defendant "pushed her and she fell against the cement and hit her face on a—a curbing, like a headstone to a parking space." The state concedes that the later statements that the victim gave Clough *were* testimonial in nature. In those statements, the victim said that, prior to the assault, she and defendant were at a bar, that defendant had made a racial remark, and that they had been asked to leave.

We accept the state's concession that the later statements were indeed testimonial statements admitted in violation of defendant's Sixth Amendment rights. We need not decide, however, whether initial statements given to the officers were testimonial, because assuming that they were, we agree that they were, in any event, a matter of harmless error. When assessing harmlessness in cases we have to determine the possible influence of the erroneously admitted or excluded evidence on the verdict. We consider all of the evidence at trial. *See State v. Maiden*, 222 Or App 9, 11, 191 P3d 803 (2008), *rev den*, 345 Or 618 (2009) ("On appeal from a judgment of conviction, we view the evidence presented in the light most favorable to the state."); *see also State v. Cunningham*, 179 Or App 359, 361, 40 P3d 1065, *adh'd to on recons*, 184 Or App 292, 57 P3d 149 (2002), *rev'd and rem'd on other grounds*, 337 Or 528, 99 P3d 271 (2004), *cert den*, 544 US 931, 125 S Ct 1670, 161 L Ed 2d 495 (2005). In our assessment of whether the erroneous admission of

disputed evidence was harmless, we review all pertinent portions of the record, not just those portions most favorable to the state. *Cunningham*, 179 Or App at 361-62 n 2. Generally, an error is not harmful unless a substantial right of a party is affected or the error affected the verdict. OEC 103(1); *State v. Hawkins*, 261 Or App 440, 453, 323 P3d 463, *rev den*, 355 Or 880 (2014).

Where a violation of a federal constitutional right is at issue, we apply the federal harmless error standard. *Cook*, 340 Or at 544. A violation of the Sixth Amendment does not require reversal "if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986). To aid in our inquiry, we consider "the importance of the * * * testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* at 684.

As with the interviews in *Camarena*, the victim's initial statements to the officers were cumulative of the victim's statement to the 9-1-1 operator that the defendant had "pushed [her] down," and, here too, the 9-1-1 statement was an admissible, nontestimonial statement. The initial statements to the officers are also cumulative and harmless because the officers testified to the victim's injuries, and because the witness Murphy testified that the victim was "slumped down on the ground" with defendant standing over her. The victim's later statement about earlier events in the bar was of little significance to the state's case. At most, it provided a chronological context for the assault that was to occur. Defendant was able, in part, to contradict the account of events in the bar. None of those earlier events were material evidence as to the charged counts at issue. Given the victim's 9-1-1 call, evidence of her injuries, Murphy's testimony, and defendant's admission to Murphy, we conclude that, on the whole record, any error in admission of the victim's statements to the officers was harmless beyond a reasonable doubt.

## V.   CONCLUSION

In summary, the state established the victim's unavailability for the purposes of Article I, section 11, and any error in admitting the statements to the officers under the Sixth Amendment was harmless. Therefore, we affirm.

Affirmed.