HADLOCK, P.J.
*29 This pretrial appeal raises the issue of when a witness is "unavailable" for purposes of the forfeiture-by-wrongdoing exception to the hearsay rule, OEC 804(3)(g). In this criminal prosecution, defendant has been charged with domestic violence crimes of assault, strangulation, menacing, coercion, and kidnapping. After the victim failed to appear for trial, the state moved in limine to admit certain of her out-of-court statements, relying on the forfeiture-by-wrongdoing exception to the hearsay rule. Although the trial court found that the state had done "everything that [it] possibly could short of [seeking] a material witness warrant for [the victim] to get her to be" at trial and that the victim had refused to comply with the state's subpoena as a result of defendant's wrongful conduct, the court concluded that the hearsay exception did not apply because the state had not demonstrated that the victim was "unavailable," as OEC 804(3) requires. Accordingly, the trial court entered an order denying the motion in limine . The state appeals. As explained below, we agree with the state that the trial court erred and, accordingly, we reverse and remand on the state's appeal.
We also briefly address the cross-appeal that defendant has filed challenging a different pretrial evidentiary ruling of the trial court. In particular, defendant asserts in his cross-appeal that the court erred in ruling that the state would be permitted to introduce evidence at trial regarding the structure and general beliefs of the motorcycle gang of which defendant was a member. However, because the issues raised in defendant's cross-appeal would be better addressed in the context of a developed trial record, and because defendant will have the opportunity to appeal the ruling in question if he is ultimately convicted of the criminal offenses with which he is charged, we decline to exercise *240 our discretion to address defendant's cross-appeal. See State v. Shaw , 338 Or. 586, 617-18, 113 P.3d 898 (2005) (explaining that appellate court has discretion to review an intermediate decision of the trial court on a defendant's cross-appeal from a state's interlocutory appeal and observing that "a defendant has the full opportunity to appeal any intermediate adverse *30 trial court ruling if that defendant is convicted of a criminal offense"). Accordingly, we dismiss the cross-appeal. See id. at 620, 113 P.3d 898 (so disposing of the defendant's cross-appeal).
The following facts are undisputed for purposes of this appeal. Defendant is a member of the Mongols Motorcycle Club, which a detective described as an "outlaw" motorcycle gang. The charges against defendant are based on an incident involving defendant and the victim, who had been in a romantic relationship for several months. The victim found documentation relating to defendant's abuse of other women and confronted him about it. Defendant responded by choking the victim, reminding her that he was a Mongol, and asserting that she "needed to watch [her] *** mouth." During the prolonged assault that followed, defendant kicked the victim in the ribs, spat in her face, hit her on the head, and dragged her down the stairs and outside by her hair. Defendant told the victim to "look around" and "make sure [she had] a good view because he was going to kill" her and "it was the last time that [she would] be able to see anything." He then locked the victim in a trailer for a period of time and, when he came back, beat the victim with a broom handle on her face, back and legs. He also burned her leg and kicked her. Defendant again reminded the victim of his membership in the Mongols, telling her that he was the acting president of the club and that, if she went to the police, "he had a huge area that he could dig a hole and bury [her] in." He said that no one would ever find her.
Defendant then locked the victim in the trailer for hours while he went to a Mongols meeting. When he returned, he continued assaulting the victim and threatening to kill her. At some point during the incident, defendant told the victim that he was going to take several things from her house that he had given her. After the victim responded that he couldn't do so unless the police were present, defendant called her a "snitch" and a "rat," repeatedly reminding her that he was a Mongol; members of the Mongols view "rats" or "snitches" as "the lowest form of life."
Defendant eventually released the victim, who went to the hospital and also made several calls to 9-1-1. During those calls, the victim repeatedly said that defendant was *31 part of the Mongols gang and had threatened to kill her if she spoke to police. The victim expressed fear of defendant as a result of his threats to kill her and also said that she was hiding because members of the gang were looking for her. When a dispatcher told the victim that deputies would come to the hospital, the victim asked that no police come to the hospital. She asked that they call her instead and said again that defendant was a Mongol and was going to kill her.
As a result of that incident, defendant was indicted on two counts of fourth-degree assault, one count of strangulation, one count of menacing, one count of coercion, one count of second-degree assault, and two counts of first-degree kidnapping. On the day that jury selection was to begin for defendant's trial, the state alerted the court that the victim had been served with a subpoena but had not appeared. The state asked to "go forward without her." It asked the court to admit the statements that the victim had made to law enforcement officers and dispatchers and requested "pretrial rulings on her unavailability and *** [the] forfeiture by wrongdoing exception under *** 804(3)(g)."
The rule cited by the state is a part of OEC 804(3), which broadly governs the admissibility of out-of-court statements made by a declarant who is "unavailable as a witness." Under paragraph (g) of that rule, a declarant's hearsay statements are admissible against a party "who engaged in, directed or otherwise participated in wrongful conduct that was intended to cause the declarant to be unavailable as a witness, and did cause the declarant to be unavailable." OEC 804(3)(g) ; see State v. Supanchick , 354 Or. 737, 739, 323 P.3d 231 (2014). For that rule to apply, it is not necessary that the party's wrongful conduct *241 have been directed solely at making the witness unavailable. Rather, the rule may apply even when only "one purpose for [a defendant's wrongful act] was to make [a declarant] unavailable as a witness." Id . at 749, 323 P.3d 231. In such a circumstance, "the trial court could find that [the] defendant intended to make [the witness] unavailable, as OEC 804(3)(g) requires." Id . Thus, for the victim's hearsay statements to be admissible under *32 OEC 804(3)(g), the state had to show that (1) defendant engaged in wrongful conduct, (2) that wrongful conduct was intended (at least in part) to cause the victim to be unavailable as a witness, and (3) the wrongful conduct did, in fact, cause the victim to be unavailable. "In this context, [w]hat defendant intended is a question of fact" for the trial court, and we are bound by that court's factual findings if there is evidence in the record to support them. Supanchick , 354 Or. at 744-45, 323 P.3d 231.
The court held a hearing and heard evidence on whether the forfeiture-by-wrongdoing exception applied. It then made findings with respect to both the state's efforts to ensure that the witness appeared for the trial and the question whether defendant's wrongful conduct had been intended to and, in fact, did cause the victim not to appear.
With respect to the state's efforts, according to the court, the state "did everything that [it] possibly could short of [seeking] a material witness warrant for [the victim] to get her to be" at trial. The court made detailed findings about efforts the state had made to ensure the victim's attendance:
"The witness in this case is the alleged victim. The state took efforts to and, in fact, subpoenaed that witness on January 13th, 2016. Detective Rogers, the lead detective in this case, in fact, spoke with the victim after having served her with that subpoena the very next day regarding the importance of her attending the trial.
"He, on numerous occasions prior to the trial date-I think on four occasions prior to the trial date, after serving her with that subpoena-attempted to talk and actually did talk with her about the importance of showing up.
"Yesterday morning, he arranged to pick her up *** at an undisclosed location. She, at the last minute, texted him indicating that she couldn't make it that particular day but planned to attend the trial today.
"At the direction of the district attorney's office, he made efforts to track her down last night and, in fact, did locate her. He brought her in to the district attorney's last night so that the district attorney and he could discuss with her her testimony and played-apparently they played for her, in part, some of her prior statements.
*33 "The detective and district attorney both informed her it was important to be here. In fact, they offered to-in an effort to address her stated safety concerns, offered to provide her a hotel room to stay in and, in fact, rented such a hotel. She declined to take the district attorney up on that effort and, instead, said she would arrange with the detective for him to pick her up the next morning.
"When she was supposed to be picked up the next morning, she texted the detective and indicated she was not going to attend the trial.
"I note as background regarding the district attorney and the detective's efforts to try to get ahold of and seek the cooperation of the *** victim in this case-that she has, at least after her initial contact with law enforcement, indicated an unwillingness to proceed and/or to cooperate with the investigation in this matter.
"She was subpoenaed to attend the grand jury, which she chose not to attend, again, in part, because she did express concerns about a variety of things, including her safety at that time. She actually lost contact with both the district attorney's office and the detective's office-or the detective for a period of time between late November and when the officer actually served her with the subpoena in-on January 13th.
"I note that the officer had to-in order to serve her with the subpoena, he actually had to go stake out her apartment and wait for her and did that. He spent apparently a significant amount of time trying to get ahold of her. And he had tried before *242 that on several occasions, two or three occasions at least, to try to get her served with a subpoena.
"It's undisputed that the witness-the victim did not appear today at trial."
With respect to the question whether defendant's wrongful conduct caused the victim not to appear for trial, the court initially noted that, for purposes of its ruling on that issue, "when I [say] unavailable, I mean the reason that she didn't appear for trial *** when she was supposed to be here pursuant to the subpoena." The court then explained:
"Turning first to whether or not the defendant directed, engaged in, or otherwise participated in some wrongful conduct, the state relies on two sets of conduct. Some of *34 that conduct is conduct engaged in by his friends. Some of that conduct is conduct that he himself engaged in.
"* * * * *
"[T]he state has proven to me that the defendant himself did engage in several acts that were wrongful. Specifically on the day of the particular incident, we not only have the physical abuse of the victim, but we also have statements made by him to the effect that he's a, quote, mother fucking Mongol and she better watch out; that he's, quote, acting president of the Mongols club; that he told her that, according to her statements, that if * * * she told the cops anything, he had a huge area where he would dig a hole and bury her; that he told her that he would kill her if she left; that rats are the lowest form of life and that he would kill her if she ratted; that he * * * called her a snitch and you're a rat and again reminded her that he was a Mongol; that during the event, he locked her in the trailer, according to her testimony, so that he could attend a Mongols meeting over which he was supposedly presiding; that he told her he would kill her and murder her and that he had a big back yard; that he threatened to come to her house and break in.
"She also reported in numerous statements to the police-so those are the conducts that I find that he engaged in himself.
"With regard to whether those conducts were intended to cause her to be unavailable as a witness, the law does not require that that be the only reason which the conduct is engaged in. It just requires that that be a reason for which the conduct was engaged in.
"I find that those statements were intended, in part, to discourage her cooperation *** with the law enforcement and the police and going to the police.
"And then the next issue is whether, in fact, [that conduct] caused the witness to be unavailable. I'm going to find that those conducts did have the desired effect and they caused her to be fearful of cooperation with the police. In support of that, I find that on *** her initial statement to the police, which I've made specific findings about what he said to her about cooperating with the police and the consequences of that, I also find that during her various 9-1-1 phone calls she made statements to the police that made it *35 clear that she was concerned about the defendant's association with the Mongols and the Mongols carrying out retaliation against her.
"That's actually present in all three of the phone calls: The first one to EPD where she tells the police that the Mongols are going to bury her and that they are looking for her. And the second one is the Lane County Sheriff's Office, which was the first call to the Lane County Sheriff's Office but the second of the three phone calls-that her boyfriend, the defendant, who assaulted her was a Mongol and that the Mongols were looking for her; and the third that-in the third call, which was the second to the Lane County Sheriff's Office, again she reiterates the association of the defendant with the Mongols and indicates that she doesn't even want to be seen with the police in the emergency room.
"Clearly, those things all show that they are motive-fear of the Mongols and retaliation from them are motivating her in her dealings with the police.
"I also find that the numerous statements that she made to Detective Rogers regarding her fear of the Mongols and inability of the police to protect her adequately *243 from the Mongols, as well as her statements in the text messages to that effect, and her various statements demanding what I would call extraordinary security measures, specifically insisting that she [be] brought to the courthouse at night, that she be picked up at a location that was to be disclosed at the last instant, that she didn't want to be seen coming in and out of the courthouse during public hours, and didn't want to be seen with the police, all indicate that fear of retaliation is a primary-is a significant motivator."
The court found that the victim "did not appear for those reasons."[1]
Thus, the court ruled that the victim was "unavailable" as that term is used in one sense within the forfeiture-by-wrongdoing exception of OEC 804(3)(g) ; that is, the court determined that defendant's wrongful conduct was *36 intended to-and did-"cause the witness to be unavailable." Notwithstanding that ruling and the findings on which it was based, the trial court denied the state's motion to admit the victim's out-of-court statements on the basis that the state had not made reasonable efforts to secure the victim's attendance at trial. The court reasoned that the state had not established that the victim was "[u]navailable as a witness" as that phrase is used more generally in OEC 804(3) to describe the circumstances under which hearsay exceptions, like the forfeiture-by-wrongdoing exception, apply. Specifically, the court concluded that, despite the fact that the state had done "everything it possibly could" short of obtaining a warrant for the victim, the state had failed to show that the victim was "unavailable" because it could get "a warrant for her arrest either for contempt for failing to comply with the initial *** subpoena or a warrant for her arrest as a material witness." Accordingly, the court ruled that it would not admit the victim's out-of-court statements. The state challenges that ruling on appeal.
The record supports the trial court's factual findings; accordingly, we review its ultimate ruling for legal error. See State v. Simmons , 241 Or. App. 439, 453-55, 250 P.3d 431 (2011) (so reviewing). Under OEC 804(1)(e), " '[u]navailability as a witness' includes situations in which the declarant *** [i]s absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance *** by process or other reasonable means." As the Supreme Court recently explained in State v. Harris , 362 Or. 55, 66, 404 P.3d 926 (2017), the state cannot establish a witness's unavailability if it makes only minimal efforts to locate the witness and to secure his or her attendance at trial.[2] The court rejected the *244 state's assertion *37 that, to demonstrate unavailability, the state may simply show that a witness did not comply with a subpoena. Id. at 66, 404 P.3d 926. Instead, the court explained, the state "must exhaust reasonably available measures for producing the witness." Id. at 67, 404 P.3d 926. However, "the rule is one of reasonableness under the circumstances of the individual case." Id. In other words, the question for purposes of determining unavailability is whether the state has taken the measures to secure the witness's attendance that are reasonable under all of the circumstances of the particular case in question.
The state asserts that, in a case such as this, where the court found that defendant's wrongful conduct caused the victim not to appear at trial, that circumstance is important in determining what efforts on behalf of the state are reasonable. It argues that,
"[I]n a case in which the defendant has procured the victim's absence by his own efforts to prevent her from testifying, *38 he has forfeited any interest in confrontation. Because any reasonableness analysis requires an evaluation of the competing interests at stake, that forfeiture weighs heavily against any requirement for the state to force a victim to trial for the purpose of allowing confrontation."
See Supanchick , 354 Or. at 767-68, 323 P.3d 231 (forfeiture by wrongdoing also extinguishes on equitable grounds a defendant's federal and state constitutional rights, under the Sixth Amendment and Article I, section 11, to confront a witness whom the defendant has purposefully kept away from the proceeding). In the state's view, "regardless of the 'stakes' that the defendant has when he faces serious criminal charges, the reasonableness of any steps that the prosecution is required to take to obtain the victim's appearance should be evaluated in light of the fact that the defendant has waived his constitutional rights to confront her at trial."
We agree with the state that, where a defendant, by wrongful conduct, has intentionally procured a witness's absence from trial, that intentional conduct by the defendant is an important consideration in determining what the state is reasonably required to do to secure the witness's attendance. As the court explained in Supanchick ,
"where a defendant acts wrongfully to make a witness unavailable, that defendant largely controls the very feature of the evidence to which he objects. The principle of forfeiture by wrongdoing, as its history shows, ensures that a defendant cannot manipulate proceedings in that way. It likewise establishes that, if a defendant attempts that kind of manipulation, he or she cannot evade its consequences."
354 Or. at 766, 323 P.3d 231 ; see id. at 750, 323 P.3d 231 (observing, with respect to application of the forfeiture doctrine in domestic violence cases, acts "of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions" (internal quotation marks omitted)).
Here, as set forth above, the trial court specifically found that defendant had engaged in wrongful conduct that was intended to prevent the victim from cooperating in proceedings against him and that she *245 did not show up for trial *39 as a result of that wrongful conduct. Furthermore, the court found that the state had done "everything that [it] possibly could" to secure the victim's attendance at trial, short of seeking a material witness warrant. As discussed above, the victim was extremely unwilling to proceed with or cooperate in the investigation and prosecution of this case. She refused to attend grand jury because she feared for her safety and, for a period of time while the case proceeded, she did not communicate with the police or the district attorney's office. The detective in the case went to great lengths to serve the victim with the subpoena and, after serving her, talked with her a number of times about the importance of attending trial. The night before trial, the detective "track[ed] her down" and brought her to the district attorney's office to discuss the trial. At that time, both the detective and the district attorney discussed the importance of her attending trial and she agreed that she would attend. The state had rented a hotel for the victim to stay in that night in an effort to address her safety concerns, but she declined to "take the district attorney up on that effort." Instead, she agreed to allow the detective to pick her up from an undisclosed location and bring her to trial. However, when she was supposed to be picked up on the morning of trial, the victim sent a text message to the detective in which she did not disclose her location, and stated that she would not attend the trial.
The state asserts that, under the circumstances, it was not required to "re-victimiz[e] an already traumatized crime victim" by seeking her arrest as a material witness. We agree. In light of the trial court's findings, and that, by wrongfully procuring the victim's absence from trial, defendant largely controlled the circumstance to which he objected, we conclude that reasonableness did not require the state to seek a warrant for the victim's arrest in this case. Instead, the state exhausted all reasonable measures for securing the victim's attendance at trial when it "did everything that [it] possibly could" short of seeking a warrant for her arrest. Accordingly, we conclude that the trial court erred in denying the state's motion in limine to admit the victim's out-of-court statements at trial.
In closing, we emphasize what we are not holding in this case. We do not hold that, when a party has established *40 the applicability of the forfeiture-by-wrongdoing exception of OEC 804(3)(g) to a declarant's out-of-court statements, it necessarily follows that the party has also established the declarant's "[u]navailability as a witness" as that phrase is used in OEC 804(1). Rather, our conclusion that the state's efforts in this case established the witness's unavailability is fact dependent and is based largely on the trial court's finding that the state had done "everything" it could short of obtaining a warrant to secure the victim's attendance at trial. The result might be different, depending on circumstances, in a case where the trial court determined that the state reasonably could have taken-but did not take-less-drastic measures, or if the court determined that the state's efforts to secure a witness's testimony were not made in good faith. Here, however, the facts found by the trial court lead us to conclude that, as a matter of law, the state exhausted all means of producing the victim at trial that were reasonable under the circumstances and that the victim therefore was "unavailable" as that term is used in OEC 804.
On appeal, reversed and remanded. Cross-appeal dismissed.

In his answering brief, defendant asserts that the trial court's finding that his wrongful acts caused the victim not to appear for trial is unsupported by evidence in the record. We reject that contention and do not address it further, except to note that we have reviewed the record and have determined that it includes ample evidence to support the court's finding on that issue. Accordingly, that finding is binding on appeal.

Harris , like much of our case law, addresses unavailability in light of a defendant's confrontation rights under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. That is, the cases generally discuss unavailability as a constitutional requirement, not an evidentiary requirement. See, e.g. , Harris , 362 Or. 55, 404 P.3d 926 ; State v. Cook , 340 Or. 530, 135 P.3d 260 (2006) ; State v. Starr , 269 Or. App. 97, 344 P.3d 100, rev. den. , 357 Or. 415, 356 P.3d 638 (2015). However, here, as noted, the issue is what constitutes unavailability for purposes of the forfeiture-by-wrongdoing exception, an exception that "differs significantly from other hearsay exceptions." Supanchick , 354 Or. at 754, 323 P.3d 231. For purposes of this hearsay exception, it is unclear that constitutional confrontation standards regarding unavailability apply.
"[I]n Crawford [ v. Washington , 541 US 36, 62, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court] recognized that forfeiture by wrongdoing is one of a limited set of exceptions to the Sixth Amendment confrontation right." Supanchick , 354 Or. at 748, 323 P.3d 231. The "Oregon legislature enacted OEC 804(3)(g) to codify, as part of the Oregon evidence code, the doctrine of forfeiture by wrongdoing that the Court had identified in Crawford ," id. , particularly, the Court's "recognition that 'the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds,' " id. at 751, 323 P.3d 231 (quoting Crawford , 541 US at 62, 124 S.Ct. 1354 ). And, as the Supreme Court explained in Supanchick , in addition to extinguishing Sixth Amendment confrontation claims, forfeiture by wrongdoing also "extinguishes [on equitable grounds] a defendant's state constitutional right [under Article I, section 11,] to confront a witness whom the defendant has purposefully kept away from the proceeding." Id. at 767, 323 P.3d 231. Thus, we question the application of constitutional confrontation standards to the determination of unavailability for purposes of applying the forfeiture-by-wrongdoing exception. Indeed, as discussed in Supanchick , the forfeiture doctrine evolved as a way of, itself, demonstrating unavailability. See id. at 756-57, 323 P.3d 231.
The state notes that the standard for unavailability under OEC 804 may not be coextensive with the constitutional standard for unavailability. However, it asserts that we need not address that issue in this case and observes that both the constitutional and evidentiary standards require that the state make reasonable efforts to secure a witness's attendance at trial. Defendant, for his part, agrees with the state that both the constitution and the evidence code "impose a reasonableness requirement" on the state's efforts. In light of our disposition of the case, we agree that we need not resolve whether the constitutional and evidentiary standards are coextensive and, if they are not, which would apply here. First, as the parties acknowledge, both the constitution and the evidence code require that the state make reasonable efforts to secure a witness's attendance at trial. Second, we have structured our analysis around the Harris standard, assuming without deciding that it applies in this context.