No. 26                    May 4, 2017                    423

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

DOROTHY ELIZABETH RAFEH,
aka Dorothy Elizabeth Barnett,
*Petitioner on Review.*

(CC 15CR05982; CA A159531; SC S064084)

On review from the Court of Appeals.*

Argued and submitted January 13, 2017.

John Evans, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. Also on the brief was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

Joanna L. Jenkins, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Brewer, Nakamoto, and Flynn, Justices.**

KISTLER, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____
    *  On appeal from Multnomah County Circuit Court, John A. Wittmayer, Judge. Order granting summary affirmance, dated April 13, 2016.

    **  Baldwin, J., retired March 31, 2017, and did not participate in the decision of this case.

**KISTLER, J.**

In 2012, the Driver and Motor Vehicle Services Division (DMV) of the Department of Transportation suspended defendant's driver's license for three years for refusing to submit voluntarily to a blood alcohol test. Approximately two and one-half years later, defendant was stopped while driving without a license, and the state charged her with driving while suspended (DWS). *See* ORS 811.182 (defining that crime). The question that this case presents is whether the federal Confrontation Clause prohibits the admission, in defendant's DWS trial, of an earlier certification that defendant had been given notice that the state intended to suspend her driver's license.[1] The trial court admitted the certification over defendant's objection, and the jury found her guilty of DWS. The Court of Appeals summarily affirmed the resulting judgment. Having allowed defendant's petition for review, we now affirm the Court of Appeals decision and the trial court's judgment.

Before turning to the facts of this case, we set out the statutory framework under which this issue arises. When an officer stops a person for driving under the influence of intoxicants, two consequences can flow from the stop. One is criminal; the other, civil. If the officer has probable cause to believe that the person has been driving under the influence of intoxicants (DUII), the officer can arrest the person for that offense and ask the person to take a breath or blood alcohol test. ORS 813.100(1). Depending on the results of those tests, the state may initiate a criminal prosecution for DUII. *See* ORS 813.010 (defining that crime).

The other consequence is civil. Every person who operates a motor vehicle on the state highways impliedly consents to a breath or blood test to determine the person's blood alcohol content if the person is arrested for DUII. ORS 813.100(1). A person who is arrested for DUII can always refuse to take a breath or blood alcohol test. ORS 813.100(2). However, doing so can result in the person's driver's license being suspended administratively pursuant to ORS 813.410.

---

[1] The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." US Const, Amend VI.

ORS 813.100(3). That is true even if the person is not charged with or convicted of DUII. *See* ORS 813.130(2)(c) (stating that an administrative license suspension for refusing to take a breath or blood alcohol test is independent of a criminal charge for DUII).

If a driver who is arrested for DUII refuses to take a breath or blood alcohol test, ORS 813.100(3) directs the officer to take immediate custody of the person's driver's license, "provide the person with a written notice of intent to suspend, on forms prepared and provided by the Department of Transportation," and report to the department certain information set out in ORS 813.120. To comply with those statutory directives, the department has promulgated a form captioned the Implied Consent Combined Report. That report both provides notice to the driver that DMV intends to suspend his or her driving privileges and also sets out preprinted information, required by ORS 813.120, that establishes the statutory prerequisites for suspending a person's driver's license.[2]

Sending a copy of the report to the Department of Transportation initiates an administrative suspension of the person's driver's license. ORS 813.410(1). Once the department receives the report, ORS 813.410(1) directs the department to suspend the person's driver's license "on the 30th day after the date of arrest *** unless, at a hearing described under this section, the department determines that the suspension would not be valid as described in this section." *Id.* The report provides that, "[i]f no hearing is requested, the allegations contained in this document will be accepted as fact" and that the report will serve as the administrative order suspending the person's driver's license.

With that statutory background in mind, we turn to the facts of this case. On September 8, 2012, defendant was

---

[2] As relevant here, ORS 813.120 states that the report shall provide the department with "substantially all" the following information: (1) whether the person was under arrest for DUII when he or she was asked to submit to a breath or blood alcohol test; (2) whether the officer had reasonable grounds to believe that the person was under the influence of intoxicants; (3) whether the person refused to submit to a test; (4) whether the person was informed of the rights and consequence set out in ORS 813.130; and (5) whether the person was given written notice of intent to suspend as required by ORS 813.100(3)(b).

involved in a serious car accident and taken to the hospital. She refused to consent to a voluntary blood draw. After she refused consent, Deputy Cereghino with the Marion County Sheriff's Office filled out and signed the Implied Consent Combined Report. The report lists the date of defendant's arrest as September 8, 2012. It states that her driver's license will be suspended "at 12:01 a.m. on the 30th day after the date of arrest *** for the period of time and for the reason indicated below." Below that statement, two boxes are checked. The first checked box states that defendant "refused to submit to a blood test when receiving medical care in a health facility immediately after a motor vehicle accident." *See* ORS 813.100(1) (stating that a person in those circumstances impliedly consents to a voluntary blood draw). The second checked box states that, as a result of her refusal, the period of suspension is for three years. The form states that "[y]ou were given a copy of this form *** as written notice." The reverse side of the form lists a driver's rights and responsibilities. Among other things, it describes how a person can request an administrative hearing to challenge the suspension of the person's driver's license; it also specifies the time in which the request for a hearing must be filed, the contents that the request should include, and the address of the agency (DMV) where the request should be sent.

Defendant did not request a hearing, and DMV suspended her license on October 8, 2012. Less than three years later, another officer stopped defendant in Multnomah County for a traffic violation. When he asked to see her driver's license, defendant produced an identity card but no license. The officer checked defendant's driving status, learned that her driver's license was suspended, and arrested her for DWS. The state later charged defendant with that offense.

In response to that charge, defendant raised, as an affirmative defense, that she had not received notice that her driver's license had been suspended. *See* ORS 811.180(1)(b) (providing that affirmative defense to a charge under ORS 811.182). The state replied that, under that statute, that affirmative defense was "not available" if "[t]he defendant [had been] provided with notice of intent to suspend under

ORS 813.100." ORS 811.180(2)(e). The state contended, and defendant did not dispute, that the Implied Consent Combined Report constituted notice of intent to suspend under ORS 813.100.

Because there was no real dispute that defendant had been driving while her license was suspended, the primary issue at trial reduced to whether defendant had been provided with a copy of the Implied Consent Combined Report. Defendant, for her part, testified in support of her affirmative defense that she had no memory of anything that occurred on the night of the accident in 2012,[3] that she had not received a copy of the Implied Consent Combined Report either at the hospital or after she left, and that she had not been aware that her license had been suspended until the officer stopped her in 2015.

The state, for its part, did not call anyone to testify that defendant had been provided with a copy of the Implied Consent Combined Report. Rather, the only direct evidence that the state offered on that issue was contained in the report itself.[4] As noted, the report stated that defendant "[was] given a copy of this form *** as written notice." Defendant objected to that statement on federal Confrontation Clause grounds,[5] and the trial court overruled her objection based on *State v. Velykoretskykh*, 268 Or App 706, 343 P3d 272 (2015). We allowed defendant's petition for review to consider whether the statement in the report— that defendant was given a copy of the report as written

---

[3] According to defendant's testimony at the DWS trial, "the hospital said that my blood alcohol limit [after the 2012 accident] was a 3.52 [*sic*], so [it was] enough to kill a walrus."

[4] The record contains indirect evidence from which the jury could have inferred either that defendant had received a copy of the report or that she was otherwise on notice that her license had been suspended. However, that inference is not so strong that we can say that any error in admitting the report was harmless.

[5] Defendant did not object to the admission of the report as a whole. Rather, her trial counsel was careful to specify the particular statement in the report to which defendant objected—namely, the statement that defendant "[was] given a copy of this form *** as written notice." *Cf. State v. Brown*, 310 Or 347, 800 P2d 259 (1990) (explaining that, when a party unsuccessfully objects to evidence as a whole without segregating inadmissible parts of the evidence from admissible parts, the trial court's ruling will be sustained if any part of the evidence is admissible).

notice—was "testimonial" evidence prohibited by the federal Confrontation Clause.[6] *See Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004).[7]

In our view, this court's decision in *State v. Copeland*, 353 Or 816, 306 P3d 610 (2013), goes a long way towards resolving defendant's federal Confrontation Clause challenge. In *Copeland*, a deputy sheriff certified that he had served a copy of a restraining order on the defendant, who was later charged with criminal contempt for violating that order. At the contempt proceeding, the deputy's certificate of service was admitted to prove that the order had been served on the defendant. We upheld the trial court's ruling admitting the certificate of service over the defendant's objection. Regarding his federal Confrontation Clause argument, we reasoned:

> "[T]he primary purpose for which the certificate of service in this case was created was to serve the administrative functions of the court system, ensuring that [the] defendant, the respondent in the restraining order proceeding, received the notice to which he is statutorily and constitutionally entitled, establishing a time and manner of notice for purposes of determining when the order expires or is subject to renewal, and assuring the petitioner that the subject of the order knew of its existence. It was foreseeable that the certificate might be used in a later criminal prosecution to furnish proof that [the] defendant had notice that the order had been entered against him. However, the

---

[6] Perhaps because of *State v. Copeland*, 353 Or 816, 306 P3d 610 (2013), defendant does not argue on review that the statement is inadmissible under the Oregon evidence code, nor does she argue that the state confrontation clause prohibits the statement's admission. We accordingly confine our inquiry to defendant's federal constitutional challenge. *Cf. State v. Mack*, 337 Or 586, 101 P3d 349 (2004) (following a similar course where defendant raised only a federal constitutional challenge).

[7] In *Crawford*, the Court held that, with limited exceptions, the federal Confrontation Clause prohibits the admission of "testimonial evidence" for the truth of the matter asserted unless the defendant had an opportunity to cross-examine the declarant. 541 US at 59-60 n 9, 62. Although the Court did not provide a definitive definition of testimonial evidence in *Crawford*, it held that the out-of-court statements in that case—witness accounts of past events made during a police interrogation—fell squarely within the core definition of testimonial evidence. *Id.* at 68-69. Since *Crawford*, the Court has continued to refine the concept of testimonial evidence, and the question in this case is whether the challenged statement case comes within that concept—a question that we discuss in greater detail below.

> more immediate and predominant purpose of service was to ensure that [the] defendant could—and would—comply with the order—that is, avoid a violation, consistently with the primary goal of the [Family Abuse Prevention Act] process, which is 'abuse prevention,' not punishment."

353 Or at 846. As we read *Copeland*, it concluded that, because the primary purpose for creating the certificate of service was for administrative reasons and not for use in a later criminal proceeding, the certificate was not "testimonial" evidence that the Confrontation Clause prohibits.

If the certificate of service in *Copeland* was not testimonial evidence prohibited by the Confrontation Clause, then it is difficult to see why the challenged statement in the Implied Consent Combined Report was. Both statements serve the same function. Like the certificate of service in *Copeland*, the statement in the Implied Consent Combined Report certified to DMV that defendant had been given a copy of the report as written notice that her license would be suspended within 30 days unless she requested an administrative hearing. That statement was not made for use in a criminal proceeding; it served instead as an assurance to DMV that defendant had received the notice necessary to initiate an administrative suspension of her driver's license. Its primary purpose was for use in an administrative proceeding, not in a criminal proceeding.

Admittedly, it was possible that the certification could be used in a future criminal proceeding. Specifically, if defendant's driver's license was suspended, if she drove while her license was suspended, was discovered doing so, and was charged with DWS, and if she asserted, as an affirmative defense to that charge, that she had not been aware that her license had been suspended, then the deputy's certification would be relevant to rebut her defense. However, the likelihood that the certification would be relevant in a future criminal DWS trial depends on the occurrence of those multiple contingencies. In that respect, the likelihood of the certification's use in a future DWS trial is more remote than the likelihood that the certificate of service in *Copeland* would be used to prove that the defendant in that case was aware that a restraining order had been issued against him. It follows in this case, as it did in

*Copeland*, that the primary purpose of the deputy's certification to DMV was administrative—to confirm to DMV that defendant had been given sufficient notice for DMV to proceed with an administrative suspension of her driver's license. Under *Copeland*, the deputy's certification was not "testimonial" evidence that the federal Confrontation Clause prohibits.

Defendant argues, however, that *Copeland* either was incorrectly decided or is distinguishable. She argues initially that certifications, such as the one here and perhaps in *Copeland*, come within the "core class" of testimonial evidence identified in *Crawford* and, for that reason, run afoul of the Confrontation Clause. That is so, defendant argues, regardless of whether the statements were made for use in civil or criminal proceedings. Second, and alternatively, she contends that, because the primary purpose of the Implied Consent Combined Report was to establish facts that may be relevant to a criminal prosecution, the statement is inadmissible testimonial evidence. In considering defendant's argument, we begin with the Court's Confrontation Clause cases. We then turn to her argument regarding how those decisions apply in this case.

Since the Court decided *Crawford* in 2004, the focus in federal Confrontation Clause cases has been whether out-of-court statements offered for the truth of the matter asserted are "testimonial" evidence. If the evidence is testimonial, the consequences are clear. Subject to limited exceptions, the federal Confrontation Clause prohibits the admission of testimonial evidence for the truth of the matter asserted unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford*, 541 US at 59-60 n 9, 62. The more difficult question has been determining what constitutes testimonial evidence. Although *Crawford* identified "testimonial evidence" as the central concern of the federal Confrontation Clause, the Court did not have occasion to define the boundaries of that concept in *Crawford*. *See id.* at 51-52 (noting that "various formulations of this core class of 'testimonial' statements exist" but finding it unnecessary to choose among them). Rather, in that case, the police had interrogated a witness as part of a criminal investigation, and the Court explained

that the witness's statements regarding what had happened constituted "testimonial evidence" under any definition of that phrase. *Id.* at 69.

More specifically, the Court explained in *Crawford* that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.* at 50. The Court noted that, consistently with that focus, the text of the Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony,'" which was defined in a contemporaneous dictionary as "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 51 (quoting an 1828 dictionary). It followed, the Court reasoned, that the Confrontation Clause prevents not only the use of testimonial evidence obtained in *ex parte* bail and committal examinations, the use of which had given rise to the Clause, but also to testimonial evidence obtained in the modern day analogue of those *ex parte* examinations—investigations of criminal conduct by police. *Id.* at 53.

The evidence at issue in *Crawford* fell squarely within that core concern—the police were questioning a witness to obtain evidence for use in a later criminal proceeding. In the cases decided after *Crawford*, the Court has made clear that not all statements made in response to police questioning constitute testimonial evidence even when offered for the truth of the matter asserted. What matters is whether "the primary purpose of the interrogation [wa]s to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 US 813, 822, 126 S Ct 2266, 165 L Ed 2d 224 (2006). Conversely, when "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency," the statements will not be testimonial. *Id.*[8]

_____

[8] The primary purpose for which a statement was either elicited or made is assessed objectively. *Michigan v. Bryant*, 562 US 344, 359-60, 131 S Ct 1143, 179 L Ed 2d 93 (2011); *Davis*, 547 US at 822. Accordingly, the Court has independently "evaluate[d] the circumstances in which the encounter occurs and the statements and actions of the parties" in determining the primary purpose for which the statement was made. *Bryant*, 562 US at 359. We employ the same standard of review.

As the Court observed in *Davis*, those two categories of statements do not exhaust the field. *Id*. That is, "'[t]he existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry. *** Instead, whether an ongoing emergency exists is simply one factor *** that informs the ultimate inquiry regarding the "primary purpose" of the interrogation.'" *Ohio v. Clark*, 576 US ___, 135 S Ct 2173, 2180, 192 L Ed 2d 306 (2015) (quoting *Michigan v. Bryant*, 562 US 344, 374, 366, 131 S Ct 1143, 179 L Ed 2d 93 (2011); citations omitted; second ellipsis in *Clark*). In making that assessment, the formality or informality of the statement bears on its testimonial character. *Id*.

The Court's two most recent Confrontation Clause cases confirm our understanding in *Copeland* that the question whether a statement is testimonial turns on whether it was elicited or made for use in a criminal proceeding. *See Clark*, 135 S Ct at 2177; *Williams v. Illinois*, 567 US 50, 132 S Ct 2221, 183 L Ed 2d 89 (2012). In *Williams*, the plurality would have held that a DNA profile used to identify the defendant as the perpetrator of a crime was not testimonial evidence, even if offered for the truth of the matter asserted; the plurality explained that the profile had not been prepared for "the primary purpose of accusing a targeted individual of engaging in criminal conduct." 132 S Ct at 2242 (plurality). Justice Thomas concurred in the judgment but would have stated the test more broadly; specifically, he "agree[d] that, for a statement to be testimonial within the meaning of the Confrontation Clause, the declarant must primarily intend to establish some fact with the understanding that [the declarant's] statement may be used in a criminal prosecution." 132 S Ct at 2261 (Thomas, J., concurring in the judgment).[9]

---

[9] Justice Thomas disagreed with the plurality that a statement would be testimonial only if it were made for "'the primary purpose of accusing a targeted individual of engaging in criminal conduct.'" 132 S Ct at 2262 (opinion concurring in the judgment) (quoting plurality opinion). In his view, the plurality's focus on "a targeted individual" was too narrow because any statement made before the suspect was identified would be beyond the scope of the Confrontation Clause, a result that was inconsistent with the historical practices that had led to the adoption of the Clause. *Id*. Although Justice Thomas concluded that the DNA profile at issue in *Williams* had been prepared primarily for use in a criminal trial, and thus disagreed with the plurality on that point, he concurred in the judgment because, in his view, the profile lacked the solemnity and formality that testimonial evidence requires. *Id*. at 2260-63.

The Court clarified the standard in *Clark*. In that case, a teacher noticed "'[r]ed marks, like whips of some sort,'" on a three-year old child's face. 135 S Ct at 2178. When the teacher asked the child, "'Who did this? What happened to you?,'" the child identified the defendant as the person who had harmed him. *Id.* At the defendant's trial for assault, the trial court ruled that the child was not competent to testify but admitted the child's identification of the defendant over a federal Confrontation Clause objection. *Id.* The Court upheld the ruling. It explained: "Because neither the child nor his teachers had the primary purpose of assisting in [the defendant's] prosecution, the child's statements do not implicate the Confrontation Clause and therefore were admissible at trial." *Id.* at 2177.

In reaching that conclusion in *Clark*, the Court retraced its Confrontation Clause cases beginning with *Crawford*. *Id.* at 2179-80. It noted that the child's statement at issue in *Clark* differed from statements in earlier cases because the statement had been made to a teacher, and not to law enforcement officers. *Id.* at 2181. The Court declined to find, however, that all statements made to persons other than law enforcement officers will be nontestimonial, although it noted that "such statements are much less likely to be testimonial than statements to law enforcement officers." *Id.* Rather, it concluded that the child's statements were not testimonial because they "clearly were not made with the primary purpose of creating evidence for [the defendant's] prosecution." *Id.* In reaching that conclusion, the Court looked at the statement from both the teacher and the child's perspectives. *Id.*; *see Bryant*, 562 US at 367-68 (explaining that both the questioner and the declarant's purpose bear on the primary purpose determination).

The Court concluded that, from the teacher's perspective, the primary purpose of the question was to identify the abuser to protect the child from further harm. *Clark*, 135 S Ct at 2181. That was so, the Court reasoned, regardless of "[w]hether the teachers thought that [protecting the child] would be done by apprehending the abuser or by some other means." *Id.* Similarly, even though the teachers were mandatory reporters, the Court reasoned that "mandatory reporting statutes alone cannot convert a conversation

between a concerned teacher and her student into a law enforcement mission aimed primarily at gathering evidence for a prosecution." *Id.* at 2183. Finally, the Court noted that studies showing that children "have little understanding of prosecution" made it "unlikely that a 3-year-old child in [the child's] position would intend his statements to be a substitute for trial testimony." *Id.* at 2182 (internal quotation marks omitted).

Given *Clark*, we reaffirm our decision in *Copeland*. If a statement is "not made [or elicited] with the primary purpose of creating evidence for [the defendant's] prosecution," then the statement is not testimonial. *See id.* It is true, as defendant notes, that the Court has sometimes said that a statement will be testimonial if "the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *See id.* at 2180 (quoting *Bryant*, 562 US at 358). Defendant focuses on that statement and similar statements in *Crawford*. Those statements, however, should not be divorced from the context in which they were made. The question in *Bryant* and in *Crawford* was whether police officers were seeking to create "an out-of-court substitute" for testimony in a criminal trial. To accept defendant's expansive interpretation of the Confrontation Clause, not only would we have to overlook the context in which the statements on which he relies were made, but we also would have to ignore the Court's holding in *Clark* that only out-of-court statements made or elicited primarily for use in a criminal proceeding are testimonial.

Following *Clark* and *Copeland*, we conclude that the certification in the Implied Consent Combined Report was not made for "the primary purpose of assisting in [defendant's] prosecution." *Clark*, 135 S Ct at 2177; *see also id.* at 2184 (Scalia, J., concurring in the judgment) (explaining that, in asking the child who had harmed him, the teacher did not "have the primary purpose of establishing facts for later prosecution"). Rather, as explained above, the primary purpose of the certification is administrative. It confirmed that defendant had received sufficient notice for DMV to proceed with an administrative license suspension hearing. And the decision whether to suspend defendant's license was undertaken to ensure the safety of the other drivers

on the state's roads, much in the same way that the child's statement in *Clark* identifying who had harmed him was elicited to protect the child from further harm. Indeed, the challenged certification—that defendant had been given a copy of the report as written notice—would have no relevance to a prosecution for DUII. And, as explained above, the prospect that the certification might become relevant in some future prosecution for DWS turns on far too many contingencies to say that the certification's primary purpose was for use in a criminal proceeding.[10]

Defendant offers essentially three contrary arguments. She contends that the report, as a whole, was testimonial because (1) it is a formal or solemn statement; (2) it was made during a criminal investigation; and (3) it recounts facts that are relevant both to a prosecution for DUII and DWS. It follows, she concludes, that the primary purpose for making the statements in the report was for use in a criminal proceeding. We consider those arguments briefly.

As defendant correctly notes, the certification at issue in this case is a formal statement rather than an offhand remark. And, as the Court has explained, the formality or informality of a statement is one indication of whether the statement was made or elicited for the primary purpose of use in a prosecution. "A 'formal station-house interrogation,' like the questioning in *Crawford*, is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." *Clark*, 135 S Ct at 2180 (quoting *Bryant*, 562 US at 366). While the certification is formal, its formality derives from the role that it plays in initiating an administrative proceeding to suspend a person's driver's license. In this case, the challenged statement was made to *DMV* for its use in an administrative license suspension hearing. *See id.* at 2181 (noting that

---

[10] As noted above, it was possible that the certification could be used in a DWS proceeding if the defendant's license was suspended, she drove while her license was suspended, she was charged with that offense, and she raised, as an affirmative defense to that charge, that she was not aware that her license had been suspended. However, the prospect that that concatenation of events would ever come to pass is so distant that we can say objectively that the primary purpose of the certification was not for use in a future criminal proceeding.

the entity to whom the statement is made bears on whether its primary purpose was for use in a criminal proceeding). The statement certified to DMV that defendant had received notice that her driver's license would be suspended unless she requested an administrative hearing. In these circumstances, we conclude, as we did in *Copeland*, that the formality that attends the certification does not suggest that its primary purpose was for use in a criminal proceeding.

Defendant's second and third arguments are interrelated. We assume, as defendant argues, that Deputy Cereghino completed the Implied Consent Combined Report contemporaneously with an investigation into whether defendant had driven while intoxicated. It is also true that some of the statements included in the report bear on whether defendant was driving while intoxicated. However, as *Davis* makes clear, a single conversation can contain both testimonial and nontestimonial statements. 547 US at 828-29. It follows that the inquiry should focus on the primary purpose of the challenged statement rather than the purpose of the conversation as a whole. *See id.* Only testimonial statements need be excluded. *See id.* at 829 (explaining that "[t]hrough an *in limine* procedure, [trial courts] should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence").

We accordingly focus on the challenged certification, not on the report as a whole. Given that focus, we reiterate that the certification's primary purpose is not testimonial. Rather, its primary purpose was to confirm to DMV that the administrative proceeding could go forward because defendant had received notice that her license was subject to suspension unless she requested an administrative hearing. It is certainly true, as defendant notes, that the Implied Consent Combined Report also contains statements that bear on whether the officers had probable cause to arrest defendant for driving under the influence of intoxicants. Defendant, however, did not object to the admission of those statements in her DWS trial. Accordingly, we need not decide whether, as the state argues, the primary purpose of including those statements in the Implied Consent Combined Report was administrative—*i.e.*, to establish

that the statutory prerequisites for suspending defendant's driver's license had been met. Similarly, we need not decide whether, as defendant argues, the primary purpose of including those preprinted statements in the report was to memorialize evidence for use in a criminal proceeding.

Rather, we limit our decision to the statement that defendant has challenged—the certification that she received notice of the state's intent to suspend her driver's license. In this case, it is sufficient to hold, as we did in *Copeland*, that that certification was not testimonial evidence within the meaning of *Clark* and *Crawford*. It follows that the trial court correctly ruled that the federal Confrontation Clause did not prohibit the admission of that certification in defendant's DWS trial.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.