Argued and submitted June 2, 2021, affirmed March 22, 2023

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KARI LYNN RYTTING,
*Defendant-Appellant.*

Umatilla County Circuit Court
18CR49400, 19CN00274;
A172044 (Control), A172045

527 P3d 777

Defendant appeals from a judgment of conviction for failure to appear in the first degree, ORS 162.205, and contempt of court, ORS 33.015 and ORS 33.065. She assigns error to the trial court's admission of two signed release agreements over her objections, contending that the admission of the release agreements violated her confrontation rights under the Sixth Amendment to the United States Constitution because they are testimonial. *Held*: The trial court did not err, because the forced release agreements were not testimonial. The Court of Appeals noted that the challenge on appeal was to the document as a whole, not to individual statements contained within the document. The court concluded that the release agreements were not prepared as part of an investigative law enforcement request, and serving as *prima facie* evidence was not the agreements' primary purpose.

Affirmed.

Daniel J. Hill, Judge.

Peter Klym, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Kamins, Presiding Judge, and Lagesen, Chief Judge, and James, Judge pro tempore.

JAMES, J. pro tempore.

Affirmed.

**JAMES, J. pro tempore**

Defendant was tried to the court on two counts of failure to appear in the first degree, ORS 162.205, in Case No. 18CR49400 (Counts 1 and 2), and one count of contempt of court, ORS 33.015 and ORS 33.065, in Case No. 19CN00274 (contempt count). On the failure to appear counts, the court acquitted defendant on Count 1 and convicted on Count 2, based on defendant's violation of a forced release agreement—a type of release agreement jails use to manage overcrowding. The trial court also found defendant in contempt.

Defendant appeals, making two assignments of error. In one, she challenges the trial court's denial of her motion for judgment of acquittal on the contempt count. We conclude that the evidence, viewed in the light most favorable to the state, was sufficient to survive a motion for judgment of acquittal and reject that assignment of error without further discussion. In her other assignment of error, which goes to the failure to appear count on which she was convicted, defendant argues that the trial court erred in admitting two signed release agreements over her objections, contending that the admission of the release agreements violated her confrontation rights under the Sixth Amendment to the United States Constitution because they are testimonial. We conclude that, based upon this record, and based upon the arguments the parties made, the forced release agreements in this case were not testimonial and affirm.

All of the relevant events took place in 2017. Defendant was released from the custody of the Umatilla County Jail on February 21 in Case No. CF150748 and signed a sworn release agreement. After she failed to appear on July 10, a warrant was issued, and she was taken into custody. While in custody, she appeared again in court on July 27, and she was instructed to appear again on August 2. On July 28, she signed a second release agreement, which we reproduce below:

| STATE OF OREGON | FILED UMATILLA COUNTY CIRCUIT COURT | AGREEMENT AND ORDER |
|---|---|---|
| Umatilla County | | FOR RELEASE |
| Case No. CF150748 | 2017 JUL 31 AM 9:20 | DUE TO OVERPOPULATION |
| STATE OF OREGON    v.    TRIAL COURT ADMINISTRATOR | | Rytting, Kari Lynn |

I AGREE if the Umatilla County Criminal Justice Center releases me on the charges of: Fail to Appear I

- I will appear for trial and all required court appearances and if convicted, I will appear for sentencing
- I will keep the Court and my attorney notified *in writing* of any changes in my address.
- I will obey all laws, local, state, and federal.

**Failure to appear as required by this agreement is a separate crime.**

I FURTHER AGREE to the following conditions of my release:

☑ I will have **no direct or indirect contact** with the victim of my crime.

| NAME | DOB | SEX RACE |
|---|---|---|
| NAME | DOB | SEX RACE |
| NAME | DOB | SEX RACE |

☐ I will have **no direct or indirect contact** with the following: _____

- If the District Attorney's office does not file a criminal case in the Circuit Court within thirty (30) days, the above "no contact" order provision will expire. The defendant shall not leave the State of Oregon for thirty (30) days.

☒ Other conditions or restrictions: APPEAR FOR ALL FUTURE COURT DATES.

| NEXT COURT DATE: August 2nd 2017 | TIME: 8:15 am |
|---|---|

| ☐ 1 | Umatilla County Circuit Court 216 SE 4th St. | ☒ 4 | Umatilla County Circuit Court 915 SE Columbia Dr. | ☐ | Pendleton Municipal Court 501 SW Emigrant Ave. |
| ☐ 2 | Pendleton, OR 97801 | ☐ 5 | Hermiston, OR 97838 | | Pendleton, OR 97801 |
| ☐ 3 | | | | ☐ | Hermiston Municipal Court 330 S. 1st Place |
| ☐ 2nd floor room 209 | | | | | Hermiston, OR 97838 |

I have read this agreement, or had it read to me, and I understand the terms contained herein.

SIGNATURE OF DEFENDANT

Kari Rytting
PRINT OR TYPE NAME OF DEFENDANT

Subscribed and sworn before me on July 28, 2017

DEPUTY CLERK
NAME    STATE# 4    DEF# ___
PRINT OR TYPE NAME    ADM ✓    DND ___

CASE # 18CR49400

cc (1) court   (2) DA   (3) jail   (4) defendant

After being required to sign that agreement, defendant was again released.[1] She subsequently failed to appear on August 2.

Defendant was charged with two counts of failure to appear: Count 1, based on failing to appear on July 10,

---

[1] The two release agreements at issue are functionally identical, with only the court dates differing.

violating the first agreement, and Count 2, based on failing to appear on August 2, violating the second agreement. At trial, the release agreements were admitted into evidence over defendant's objection that they violated the Confrontation Clause of the Sixth Amendment.

The state called one witness—a judicial specialist the Umatilla Circuit Court employed. The trial court determined that the specialist was the custodian of the court records, which constituted business records. The specialist identified defendant as the defendant in Case No. CF150748 and testified to the contents of the release agreements and defendant's failures to appear as recounted above. Defendant was convicted of Count 2, failure to appear in the first degree, a Class C felony, based on failing to appear on August 2, 2017, violating the second release agreement.

On appeal, defendant argues that the statutes creating forced release agreements, ORS 169.046 and ORS 169.064, demonstrate that the primary purpose of the agreement is to create evidence for a criminal prosecution. Therefore, she argues, the forced release agreements are testimonial and require confrontation under the Sixth Amendment.[2] The state responds that "[w]hile it might have been foreseeable that the agreements could be used in a criminal prosecution, the more immediate and predominant purpose was to ensure that defendant would appear at her court dates." Furthermore, the state argues that the legislative history shows the purpose of the release agreements is "to ensure the smooth functioning of the court system by stopping the constant cycling through the system of offenders who repeatedly flouted court dates, resulting in the waste of judicial resources." Moreover, the state contends that "[w]hile it may at some future point be used in a prosecution, [the release agreement] is given to all defendants who are released due to a jail population emergency and is therefore kept in the normal course of court operations for reasons other than facilitation possible future prosecution."

We review whether a statement is testimonial for the purposes of the Sixth Amendment for legal error. *State*

_____

[2] Defendant confines her argument to her confrontation rights under the Sixth Amendment and not under Article I, section 11, of the Oregon Constitution.

*v. Starr*, 269 Or App 97, 107, 344 P3d 100, *rev den*, 357 Or 415 (2015).

The Sixth Amendment applies to the states via the Fourteenth Amendment, *Pointer v. Texas*, 380 US 400, 400-01, 85 S Ct 1065, 13 L Ed 2d 923 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ∗∗∗ to be confronted with witnesses against him." In *Crawford*, the Court held that the Confrontation Clause prohibits the admission of out-of-court statements that are testimonial in nature unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant concerning the statements. *Crawford v. Washington*, 541 US 36, 68, 124 S Ct 1354, 158 L Ed 2d 177 (2004). A testimonial statement is "typically a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 51 (brackets and citation omitted).

To determine whether a statement is testimonial under the Sixth Amendment, we evaluate its primary purpose. *State v. Copeland*, 353 Or 816, 842, 306 P3d 610 (2013). Following *Melendez-Diaz v. Massachusetts*, 557 US 305, 129 S Ct 2527, 174 L Ed 2d 314 (2009), business and public records generally do not raise confrontation concerns because they have "'been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial.'" *Copeland*, 353 Or at 842 (quoting *Melendez-Diaz*, 557 US at 324). However, to determine whether or not a forensic analyst's report was testimonial, the *Melendez-Diaz* court looked to the facts that (1) the document provided precisely the same information that a witness "'would be expected to provide if called at trial[;]'" (2) it was prepared in response to an investigative law enforcement request; and (3) its sole purpose was to provide *prima facie* evidence in a criminal proceeding. *Copeland*, 353 Or at 843 (discussing *Melendez-Diaz*).

In *Copeland*, the defendant argued that a deputy's certificate of service for a restraining order was testimonial and required confrontation under the Sixth Amendment. *Id.* at 818. The court disagreed, reasoning that the certificate could be distinguished from the testimonial forensic reports in *Melendez-Diaz*. First, the certificate of service was not

prepared in response to a request made by law enforcement during the course of an investigation. *Id.* at 843. Second, the statutes governing the service of process demonstrated that the certificate was made for the primary purpose of the "administration of an entity's affairs." *Id.* The sheriff had a legal duty to personally serve the restraining order. That duty was defined by statute and entailed "[t]he routine fulfillment of those duties" that "ensures that respondents in restraining order proceedings receive the notice which they are statutorily *** entitled ***." *Id.* Moreover, the fact that the document was offered to prove an element of a crime in a subsequent prosecution was not dispositive for determining whether or not it was testimonial. *Id.* at 847.

As *Copeland* explained, decisions subsequent to *Melendez-Diaz* that look to the primary purpose of the statement reinforce these distinctions. *Id.* at 844-45. In *Williams v. Illinois*, 567 US 50, 132 S Ct 2221, 183 L Ed 2d 89 (2012), an expert witness testified in a rape trial that a DNA profile a private laboratory produced from vaginal swabs taken from the rape victim matched a DNA profile a police laboratory produced from a sample of the defendant's blood. 567 US at 56-57. The *Williams* plurality determined that the testimony did not violate the Confrontation Clause, and that even if the prosecution had elicited testimony about the laboratory report to establish its truth, there would not have been a violation. *Copeland*, 353 Or at 845 (discussing *Williams*). The *Williams* plurality applied an objective test to determine "'the primary purpose that a reasonable person would have ascribed to the [out-of-court] statement, taking into account all of the surrounding circumstances.'" *Id.* (quoting *Williams*, 567 US at 84). Because the primary purpose of the report "was not 'to accuse [the defendant] or create evidence for use at trial,'" the laboratory technicians had no incentive to fabricate the report. *Id.* (quoting *Williams*, 567 US at 84). The *Williams* plurality left unsettled the specific inquiry to determine whether the primary purpose of an out-of-court statement is testimonial. *Id.*

The Court clarified its primary purpose standard in *Ohio v. Clark*, 576 US 237, 135 S Ct 2173, 2180, 193 L Ed 2d 306 (2015). *See also United States v. Fryberg*, 854 F3d

1126, 1134-35 (9th Cir 2017) ("'The "primary purpose" of a statement is determined objectively.' *United States v. Rojas-Pedroza*, 716 F3d 1253, 1267 (9th Cir 2013) ('That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in the particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.')"). The Oregon Supreme Court has understood *Clark* to reaffirm the reasoning in *Copeland*, which concluded that "[i]f a statement is 'not made [or elicited] with the primary purpose of creating evidence for [the defendant's] prosecution,' then the statement is not testimonial." *State v. Rafeh*, 361 Or 423, 434, 393 P3d 1155 (2017) (quoting *Clark*, 135 S Ct at 2182 (brackets in *Rafeh*)).

        In *Rafeh*, the defendant refused to submit to a blood alcohol test, and her license was suspended. *Id.* at 425. She was stopped again during the suspension and cited for driving while suspended (DWS). *Id.* In her DWS trial, the defendant challenged the admission of a certification, which she had received, that the state intended to suspend her license, claiming that it violated her right to confrontation. *Id.* The *Rafeh* court determined that the primary purpose of the certification was for use in an administrative proceeding, not in a criminal proceeding. *Id.* at 430. It analogized the certification to the certificate of service in *Copeland*, concluding that, even though it was possible the certification could be used in a future criminal proceeding, "the likelihood that the certification would be relevant in a future criminal DWS trial depends on the occurrence of *** multiple contingencies," such as whether the defendant drove while her license was suspended, was discovered doing so, and was charged with DWS. *Id.* Based on those various contingencies, the *Rafeh* court understood the certification as primarily administrative, in contrast to the forensic certification in *Melendez-Diaz*, which was prepared exclusively to furnish evidence in a criminal proceeding against the defendant.[3]

---

[3] A question *Rafeh* raised but left unanswered is the extent to which other features of the Implied Consent Combined Report at issue in that case contained statements that might have served a testimonial purpose. For example, the defendant pointed to statements in the report that concerned whether officers

Numerous courts have relied on the distinction between a document that *will* be used for a criminal prosecution as opposed to one that *could* be used to discern the primary purpose of the statement. *See People v. Nunley*, 491 Mich 686, 821 NW 2d 642, 655-58, *cert den*, 568 US 1029 (Mich 2012) (concluding that a certificate of mailing is not testimonial and identifying additional authorities in agreement from two other state supreme courts); *United States v. Bustamante*, 687 F3d 1190, 1192-94 (9th Cir 2012) (concluding that a document containing a transcription of information from a birth certificate was testimonial because it was not a copy and was, in essence, "an affidavit testifying to the contents of *** birth records" that had been prepared "for the purpose of [a previous] investigation into [the defendant's] citizenship"); *State v. Carter*, 238 Or App 417, 425, 241 P3d 1205 (2010), *rev den*, 350 Or 130 (2011) (concluding that a bench warrant did not constitute a testimonial statement because it was created for the administration of the trial court's process rather than to prove some fact at trial).

We turn now to defendant's argument that the signed release agreements were testimonial and required confrontation. And we begin with some clarification of what is not at issue in this case. First, as is apparent from the release agreements, and unlike a typical lab report, there are multiple potential speakers. The dates of future court proceedings appear to be the statements of court staff. The statement, "I have read this agreement, or had it read to me, and I understand the terms contained herein," followed by defendant's signature, purport to be the statements of defendant herself. Then, the statement "subscribed and sworn before me" appears to be the statement of the corrections officer that obtained defendant's signature. On appeal,

had probable cause to make an arrest for driving under the influence of intoxicants. *Id.* at 437. The court did not evaluate whether the primary purpose of including those statements was administrative because the *Rafeh* defendant had not objected to the admission of those statements. *Id.* at 437-38. In addition, the court did not reach the question of whether the purpose of preprinted statements in the report was to memorialize evidence for use in a criminal proceeding. *Id.* The inquiry was focused on the specific statement challenged, which was the certification that the defendant had received notice of the state's intent to suspend her driver's license.

defendant does not parse these various statements, nor make individualized arguments. Nor does defendant raise an argument concerning compelled testimony. Defendant's sole argument is that the document as an undifferentiated whole is testimonial under the United States Constitution.

Given defendant's argument, our task is to examine the primary purpose of the release agreements. That examination is objective, aimed at discerning what a reasonable person would ascribe to the statement, considering all of the surrounding circumstances. *Williams*, 567 US at 83-84. In *Copeland* the Oregon Supreme Court expressed its understanding of *Melendez-Diaz* that there, the court focused on whether an item of evidence (1) provides precisely the same information that a witness "'would be expected to provide if called at trial[;]'" (2) was prepared in response to an investigative law enforcement request; and (3) has as its sole purpose providing *prima facie* evidence in a criminal proceeding. 353 Or at 843 (quoting *Melendez-Diaz*, 557 US at 311). We follow that same path of reasoning.

We begin with the statutes authorizing the release agreements and criminalizing the violation of it. ORS 162.205 provides:

"(1)   A person commits the crime of failure to appear in the first degree if the person knowingly fails to appear as required after:

"(a)   Having by court order been released from custody or a correctional facility under a release agreement or security release upon the condition that the person will subsequently appear personally in connection with a charge against the person of having committed a felony; or

"(b)   Having been released from a correctional facility subject to a forced release agreement under ORS 169.046 in connection with a charge against the person of having committed a felony.

"(2)   Failure to appear in the first degree is a Class C felony."

The requirements for the "forced release agreement" specified in ORS 162.205(4) are codified in ORS 169.046, and they include the following provisions:

"If it becomes necessary to order the release of adults in custody under ORS 169.042 to 169.046, the sheriff may place adults in custody on forced release subject to a forced release agreement. A forced release agreement must be in writing and be signed by the sheriff and the adult in custody and must include:

"(a)   The date of the next court appearance of the adult in custody;

"(b)   A statement that the adult in custody is required to appear at the next court appearance; and

"(c)   A statement that failure of the adult in custody to appear at the next court appearance is subject to prosecution under ORS 162.195 or 162.205."

ORS 169.046(4).

The release agreement is often essential to proof of the crime of failure to appear, ORS 162.205(1)(b). We have held that in order to convict a defendant for failure to appear, the state must prove the requisite mental state, which requires a showing that the defendant failed to appear *with an awareness* that they are failing to appear at a particular time and location after being ordered to do so. *State v. Servatius*, 285 Or App 45, 50, 395 P3d 910 (2017). In this case, the release agreements bear defendant's signature, signaling that she knew both that she must appear on August 2 and that her failure to appear would constitute a crime. But defendant does not explain how her own statements constitute a confrontation violation.

The agreements also contain an official's attestation, stating that defendant executed the agreements. The admission of the agreements, over defendant's objection, deprived her of the ability to cross-examine the official whose signature attests that he or she witnessed defendant execute it. The "crucible of cross examination" is fundamental to our system of adjudication, *Crawford*, 541 US at 61, and defendant's inability to employ that essential tool in her defense threatens to impinge on her right to be confronted with witnesses against her. At common law, "'[t]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against

the accused.'" *Hemphill v. New York*, ___ US ___, 142 S Ct 681, 690, 211 L Ed 2d 534 (2022) (quoting *Crawford*, 541 US at 50). The Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross examination." *Crawford*, 541 US at 61. As the Court has explained, that command applies to testimonial evidence regardless of whether it qualifies for admission under the hearsay rules. *Id.* And testimonial evidence includes "*ex parte* in-court testimony or its functional equivalents—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *Id.* at 51.

In *People v. Pacer*, the Court of Appeals of New York determined that an affidavit a Department of Motor Vehicles official prepared describing the agency's revocation and mailing procedures was testimonial under *Crawford*. 6 NY 3d 504, 847 NE 2d 1149, 1150 (NY 2006). The state had argued that even though the affidavit was a sworn document a government official prepared specifically for the prosecution's use at trial, the affidavit was admissible as a business record or public record and therefore outside the scope of the Confrontation Clause. *Id.* at 1151. The court found that statement was a "direct accusation of an essential element of the crime" regarding the defendant's *mens rea*, and that because no other evidence was presented to satisfy that element of the crime, "the affiant is the closest the People come to having a 'witness' to prove that defendant knew or should have known of the revocation." *Id.* at 1152. Without the ability to cross-examine the affiant, the court expounded that the defendant was unable to challenge an essential element in the state's case, including to inquire about the affiant's "information and belief" that the notice had been mailed, the frequency of mistakes in mailing revocation notices, the possibility that there were other drivers in the database with the same name as the defendant, whether the notice was returned undeliverable, or whether the affiant could reliably testify about the procedures as they had existed 16 years earlier. *Id.* at 1153. The court concluded that "the lack of a live witness to confront eliminated defendant's opportunity

to contest a decisive piece of evidence against him. This is exactly the evil the Confrontation Clause was designed to prevent." *Id.* at 1153-54.

In the instant case, the only way for defendant to challenge her signature on the forced release agreements—a form that serves as evidence of an essential element of a felony—would be to testify in her own defense. Otherwise, given that the agreements were admitted under the business records exception to the hearsay rule, defendant could only cross-examine the custodian of records to challenge the legitimacy of her signature on the agreements, not the official whose name appears on the agreements to certify defendant's attestation. That fact weighs in favor of the agreements being testimonial, but it is not dispositive.

We next ask whether the release agreements were prepared as part of an investigative law enforcement request. It indisputably was not. That weighs against its testimonial nature.

We then turn to whether the release agreements' primary purpose was to provide *prima facie* evidence in a criminal proceeding. A review of the legislative history of the release-agreement statutes is not conclusive. On the one hand, the state claims that the legislative history shows that a forced release agreement "is made for the primary purpose of 'administration of an entity's affairs,' that is, the smooth functioning of the court system. *** It is designed to provide the defendant with official written notice about future court dates and the possible consequences if he or she fails to abide by the agreement." But, as the state itself acknowledges, the purpose of ORS 169.046 was to correct an inability to prosecute failures to appear by empowering sheriffs to release prisoners, utilizing a triggering mechanism agreement, so that those released could then be prosecuted if they failed to appear. Before the enactment of ORS 169.046, only prisoners released under the authority of the court could be prosecuted for failure to appear.

A District Attorney's Association representative's committee testimony evidences both the statute's administrative purpose and its design to facilitate prosecution:

"[The bill is intended to] get rid of disconnect authority, provide a uniform process for these emergency releases and yet allow for the capability of a failure to appear prosecution where we have these people–and where I would see this being used is the constant person churning the system. They get arrested, they are not a candidate for court release because they have failures to appear or other things. They don't post bail, but they are released very quickly because of the emergency cap on the jail; they are one of the least dangerous offenders in the jail. And so they don't show up for court and they just keep circling through. And nothing really can happen then[.]"

Audio Recording, Senate Committee on Judiciary, SB 168, Feb 2, 2001, at 0:00-6:00 (statement of Marion County District Attorney Dale Penn).

The legislative history thus shows that the creation of release agreements served a dual purpose: prosecution and administration. Certainly, the agreements served *a* purpose of serving as *prime facie* evidence, but it cannot be said that it was the *sole* purpose, as was the document at issue in *Melendez-Diaz*.

As is evident, the considerations here cut both ways, and make this a close case. We acknowledge that the use of the release agreements here has some troubling aspects that mirror the concerns the Court of Appeals of New York in *Pacer* expressed. Again, we emphasize that we are not called upon here to assess individual statements within the release agreements, but to adjudicate solely the release agreements as undifferentiated documents. Ultimately, we are not persuaded that the release agreements were testimonial for purposes of the Sixth Amendment. Our survey of other jurisdictions shows that similar business and public records have been challenged under confrontation theories, but few, if any, have succeeded. *See* Jeffrey Bellin & Diana Bibb, *The Modest Impact of the Modern Confrontation Clause*, 89 Tenn L Rev 67, 106 (2021) (finding that out of 25 cases sampled in the federal appeals courts, the courts found a Confrontation Clause violation in only one; concluding that "[c]ourts interpret the business records exception to require that qualifying records were created for 'the administration of the [business's] affairs and not for the purpose

of establishing or proving some fact at trial'" and, thus, that "it should be rare that a proper application of the business records hearsay exception would result in the admission of a testimonial statement" (brackets in original)). Most importantly, we can find no instance of a similar jail release agreement ever being held testimonial, in any jurisdiction. On this record, we are unpersuaded that we should blaze that trail.

Affirmed.