No. 513 June 10, 2026 357

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JACOB MATTHEW NEBEKER,
*Defendant-Appellant.*

Washington County Circuit Court
21CR04061; A180547

Erik M. Buchér, Judge.

Argued and submitted April 10, 2025.

Andy Simrin argued the cause for appellant. Also on the brief was Andy Simrin PC.

Robert A. Koch, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.

EGAN, J.

Reversed and remanded.

**EGAN, J.**

In this criminal case, defendant appeals a judgment of conviction for murder in the second degree, ORS 163.115(1)(a), entered after a conditional guilty plea reserving the right to appeal adverse pretrial motions. . Defendant asserts three assignments of error: (1) the trial court erred by denying his motion to suppress statements that he made to an officer, arguing that any waiver of *Miranda* rights was involuntary due to intoxication; (2) the trial court erred by denying his motion to exclude statements that an unavailable witness made to a responding officer because the statements were testimonial and, therefore, inadmissible at trial under the Confrontation Clause of the Sixth Amendment to the United States Constitution; and (3) the trial court erred by denying his motion to exclude the state's proposed rebuttal evidence of defendant's prior substance use, to be used to show substance-use tolerance in the event that defendant argued an intoxication defense to the *mens rea* element required for a murder conviction.

On the second assignment of error, because we conclude that parts of the unavailable witness's statements were testimonial and, therefore, inadmissible under the federal Confrontation Clause, we reverse and remand. On the first assignment of error, defendant does not contest the trial court's ruling that circumstances were not compelling such that *Miranda* rights did not attach and no waiver was required. Consequently, the trial court did not err in denying his motion to suppress on *Miranda* grounds. However, following *State v. Miller*, 375 Or 173, 190, ___ P3d ____ (2026) (*Miller II*), the question of whether statements to law enforcement were made voluntarily is a distinct issue that was not litigated and requires further factfinding, which may be addressed on remand. Given our reversal on the second assignment, we do not resolve defendant's third assignment of error. We note that his arguments on appeal focus on relevance under OEC 401 and OEC 403 balancing, whereas his arguments before the trial court focused on whether the topic of the state's evidence required scientific expert testimony under OEC 702. As evidenced by his shift of focus on appeal, it is possible that the record may develop differently

on remand; therefore, we decline to reach defendant's third assignment of error.

## I.  BACKGROUND

When reviewing a trial court's denial of a motion to suppress, we are bound by the trial court's findings of fact, so long as there is constitutionally sufficient evidence in the record to support those findings, including implicit findings that are consistent with the court's ultimate conclusion. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We review the trial court's conclusion for legal error. *Id*. We state the facts accordingly.

Just before one o'clock in the morning on November 22, 2021, defendant's cousin, Slaven, witnessed defendant kill his mother's husband, G. Immediately after having witnessed the killing, Slaven called her husband, overcome by what she had seen. Her husband could hardly understand what Slaven was saying to him, describing her as "hysterical." Finally, he understood her to say that she had witnessed defendant kill G. He told Slaven to call 9-1-1, which she attempted to do while keeping her husband on the line. When the call went through to 9-1-1, the call with her husband dropped.

Slaven then told the 9-1-1 operator that she had witnessed defendant kill G after having heard crashing sounds coming from a bedroom in the house. She also told the operator that defendant had asked her to help him throw G's body into the river. The operator dispatched law enforcement and medical personnel to the address Slaven provided. The 9-1-1 operator kept Slaven on the line for several minutes until law enforcement arrived. The 9-1-1 operator asked questions standard to the dispatcher's role in emergency response, such as where in the house G was, if defendant was still in the house, whether Slaven needed medical attention, and whether there was a weapon involved. Throughout the call, Slaven was hiding behind a tree on a golf course abutting the backyard of the home; she was crying and at times unintelligible. At one point during the call, Slaven said that she saw defendant emerge from the house, and she dropped her voice to a whisper, saying, "I have to be quiet *** I have to

be quiet, please." She did not speak again until she said that "[defendant] just went back inside." When law enforcement arrived, they first went to the house to provide medical care for G and to contact defendant.

Among the first to arrive was Corporal Mitchell with the Washington County Sheriff's Department and two deputies. They were met at the door by defendant, who said, "he came at me" and "he's in the bathroom," stepping to the side and extending an arm to invite Mitchell and the others inside. Mitchell and the deputies found G unconscious on the bathroom floor, wedged between the toilet and the bathtub. The deputies began performing medical first aid. Mitchell asked defendant to step outside and talk, to which defendant agreed.

Mitchell and defendant walked to the driveway and stood in front of the garage, where Mitchell read defendant the *Miranda* warnings from a prepared card. When Mitchell asked if defendant understood his rights, defendant replied, "Uh-huh." Mitchell asked him to provide a yes or no and defendant responded, "Yes." Mitchell then asked defendant what happened. Defendant, as he had when he answered the door, said, "he came at me." Defendant also described sexual advances that G had made toward defendant and added, "I pushed him back."

While they spoke, Mitchell noticed several signs that defendant was intoxicated, including that defendant had dilated pupils, walked and moved slowly, and slurred his words, and that defendant was cycling rapidly between emotions—speaking excitedly, crying, and falling into a flat affect, sometimes within the span of a minute. Mitchell believed that, despite his intoxication, defendant understood his rights and was cognizant that he was being questioned, testifying that defendant mostly responded coherently to the questions that were being asked.

After about twenty minutes, when asked how G came to be bleeding on the bathroom floor, defendant responded that he felt like he was being "pushed into a corner" and invoked his right to an attorney. At that point, Mitchell ceased questioning. Later, without further questioning,

defendant made spontaneous inculpatory statements, both while sitting in a squad car, while being handcuffed, and, later, at the hospital where he had been transported for a blood draw.

Deputy Kringhelde, who was the first law enforcement officer to contact Slaven, arrived at the scene a few minutes after Mitchell and the other deputies. When she arrived, Mitchell and defendant were already talking in the driveway, but Kringhelde testified that she did not see them there. As Kringhelde approached the house, Deputy Zogg asked her to join him in the back of the house to talk to Slaven. At first, the deputies were unable to locate Slaven, who remained on the line with the 9-1-1 operator. The operator encouraged Slaven to present herself to the deputies. Slaven emerged from the trees, visibly shaken, with her hand over her mouth, and crying. Kringhelde asked Slaven if she needed medical attention. Slaven said that she did not. Kringhelde then asked Slaven a general question, such as, "what happened or what's going on?"

Without further questions from Kringhelde, Slaven responded with a thorough account of what had occurred leading up to and during the incident. Slaven told Kringhelde that Slaven and defendant had been drinking and had gone out to get food. Slaven claimed that, while in the car, defendant told Slaven that he was going to pretend to have sex with G and then kill him. Slaven also told Kringhelde that, when they returned to the house, she had seen defendant and G going in and out of the bathroom, as though they were going to have a sexual encounter. She said that defendant had come out to the kitchen to ask for gloves because he "didn't want to touch" G. Slaven told Kringhelde that she then heard crashing sounds coming from "the room where the old man sleeps," referring to G, and that G had twice yelled for help. She said that, when she went to see what was going on, she saw defendant holding a plastic bag over G's head and pulling on a rope or cord.

The entire backyard conversation lasted about five minutes, Slaven speaking through tears and labored breath. The interaction ended when Slaven lost composure entirely and had to take a knee to settle. Kringhelde then

invited Slaven, who was underdressed and not wearing shoes, to move to a warmer location. Later, law enforcement read Slaven the *Miranda* warnings and interviewed her for a more thorough statement of events.

While this case was pending in the trial court, but before defendant filed the pretrial motions described below, Slaven died.

Defendant moved to suppress evidence of the statements he made to Mitchell, arguing that his waiver of *Miranda* rights could not have been knowing, intelligent, and voluntary due to his level of intoxication. He also moved to exclude the statements Slaven made to Kringhelde in the backyard, arguing that the statements—though falling under the excited utterance exception to the rule that hearsay statements are inadmissible—were testimonial in nature and, therefore, inadmissible under the federal Confrontation Clause because Slaven was not available for cross-examination at trial, given her recent passing.[1] Finally, defendant moved to exclude the state's proposed rebuttal evidence related to defendant's past drug use, to be admitted if defendant argued that he was too intoxicated to develop the *mens rea* required for a second-degree murder conviction. The trial court denied all three motions.

Defendant entered a conditional guilty plea, reserving his right to appeal those denials. He now appeals. We begin our analysis with the second assignment of error before turning to the first.

## II.   ANALYSIS

### A.   *Sixth Amendment*

As stated above, Slaven was unavailable as a witness at trial because of her death. In his second assignment of error, defendant argues that the trial court erred by denying his motion to suppress the statements Slaven made to Kringhelde in the backyard of the home; without denying that the statements were excited utterances, he argues that the statements were testimonial and, therefore,

---

[1] Defendant also moved to suppress evidence of the calls Slaven made to her husband and to 9-1-1. The trial court denied those motions, and those rulings are not challenged on appeal.

inadmissible under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

We review for legal error whether statements made by an unavailable declarant are testimonial for purposes of confrontation rights under the Sixth Amendment. *State v. Rytting*, 324 Or App 828, 831, 527 P3d 777, *rev den*, 371 Or 477 (2023).

The Confrontation Clause of the Sixth Amendment, applicable to the states via the Fourteenth Amendment, provides a criminal defendant with a right "to be confronted with witnesses against him." *Michigan v. Bryant*, 562 US 344, 352, 131 S Ct 1143, 179 L Ed 2d 93 (2011). Under the Confrontation Clause, when a hearsay declarant is unavailable to testify at trial, only nontestimonial statements are admissible; testimonial statements are inadmissible under such circumstances, unless the defendant has had prior opportunity to cross-examine the unavailable witness. *Crawford v. Washington*, 541 US 36, 53-54, 124 S Ct 1354, 158 L Ed 2d 177 (2004). The fact that a statement qualifies as an excited utterance—and consequently is admissible as a matter of state law governing hearsay—does not exempt it from Confrontation Clause protection. *State v. Camarena*, 344 Or 28, 34, 41, 176 P3d 380 (2008).

Statements are nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 US 813, 822, 126 S Ct 2266, 165 L Ed 2d 224 (2006). Statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

Therefore, in deciding whether a declarant's statements are admissible, courts must determine the "primary purpose" of the interrogation in light of all the objective circumstances—whether it was to "meet an ongoing emergency" or "to establish or prove past events potentially relevant to later criminal prosecution." *Id.*; *State v. Case*, 328 Or

App 485, 494, 538 P3d 902 (2023), *rev den*, 372 Or 107 (2024).
In *Bryant*, the Supreme Court clarified that courts must do
so by "objectively evaluating the statements and actions of
the parties to the encounter, in light of the circumstances in
which the interrogation occurs." 562 US at 370. Importantly,
it is not just the officer's questions but also the declarant's
statements that must be assessed in Confrontation Clause
inquiries. *Id.* at 367-68 ("In many instances, the primary
purpose of the interrogation will be most accurately ascer-
tained by looking to the contents of both the questions and
the answers."); *Camarena*, 344 Or at 38-39. Under some
circumstances, an interaction between a declarant and law
enforcement will contain a mix of admissible nontestimo-
nial statements and inadmissible testimonial statements.
*Camarena*, 344 Or at 40-41 (concluding that some questions
asked and statements made in a 9-1-1 call were nontestimo-
nial and therefore admissible, while others were testimonial
and inadmissible).

Factors guiding the inquiry include (1) the exis-
tence of an ongoing emergency; (2) the temporal proximity
of the statements to the emergency event; (3) whether the
questions asked and elicited statements were necessary to
resolve the ongoing emergency, rather than to learn what
had happened in the past; and, (4) the degree of formality
of the situation and interrogation. *Davis*, 547 US at 827;
*State ex rel Juv. Dept. v. S. P.*, 346 Or 592, 609, 215 P3d 847
(2009). For example, structured interrogations taking place
at the police station and eliciting recorded statements about
events that occurred in the past are clearly testimonial.
*Crawford*, 54 US at 51-53, 65-69. Conversely, statements
made during 9-1-1 calls, while an emergency is ongoing,
are often found to be nontestimonial, so long as the elicited
information is in aid of the emergency response, which can
include a description of the circumstances of the emergency
event and the identity of the perpetrator. *Davis*, 547 US at
826-29; *Camarena*, 344 Or at 39-42.

The more difficult cases are those, such as this one,
in which a declarant has made statements to a police offi-
cer in the field during the course of an emergency response.
They are difficult because such interrogations are often

quite informal and may occur in a disorganized fashion, and yet, "what begins as an interrogation to determine the need for emergency assistance can evolve into testimonial statements." *Bryant*, 562 US at 365-66. This evolution may occur if the declarant provides police with information that makes clear that the emergency has ended and there is no longer an ongoing threat to the public. *Id.* at 365. Police may also determine that there is no longer a public threat if the perpetrator is "disarmed, surrenders, is apprehended, or * * * flees with little prospect of posing a threat to the public." *Id.*

In *Bryant*, police officers spoke to a gunshot victim in a parking lot for five to ten minutes, until emergency medical services arrived. *Id.* at 349. Police asked, "what had happened, who had shot him, and where the shooting occurred." *Id.* The declarant provided the name of the shooter and further described what had occurred, that he had been shot through the back door of the shooter's house, after having spoken to the shooter through door, and then fled from the shooter's home to the parking lot. *Id.* The Court determined that the statements were nontestimonial because police asked the type of questions necessary to allow them to assess the situation, the threat to their own safety, and possible danger to the victim and the public, and the declarant-victim provided the information necessary to meet those needs. *Id.* at 375-76. Further, the Court determined that a person in the declarant's situation—"lying in a gas station parking lot bleeding from a mortal gunshot wound to his abdomen"—would not have had a primary purpose of aiding prosecution but, rather, of enabling police to meet the ongoing emergency. *Id.* at 374-75.

In *Hammon v. Indiana*, a companion case decided with *Davis*, police responded to a reported domestic disturbance. *Davis*, 547 US at 819. When police arrived, they found the declarant sitting alone on the front porch. *Id.* Though she appeared frightened, she told police that "nothing was the matter." *Id.* Police found the perpetrator inside of the house; the man said that the two had been in an argument, that things had never become physical, and that "everything was fine now." *Id.* Police, making efforts to isolate the declarant from the perpetrator so that they could "investigate what

had happened," asked her what had occurred, and had her fill out and sign a "battery affidavit." *Id.* at 820. The Court ruled that those circumstances more closely resembled the post-emergency, stationhouse interrogation easily found to be testimonial in *Crawford*. 547 US at 829-30 ("It was formal enough that [the declarant's] interrogation was conducted in a separate room, away from [the perpetrator] (who tried to intervene), with the officer receiving her replies for use in his 'investigation.'").

In *Camarena*, the Oregon Supreme Court assessed the primary purpose of an interrogation by a 9-1-1 operator. 344 Or 28. In that case, the declarant had just been injured in a domestic dispute, and the perpetrator had fled. *Id.* at 30. After concluding that the circumstances of interrogation involved an ongoing emergency, the court held that the parts of the 9-1-1 call that established the nature and location of the emergency; the identity and location of the perpetrator, including his name and physical characteristics; and whether the declarant required medical attention were all nontestimonial and therefore admissible. *Id.* at 37-41. However, the primary purpose of the interrogation evolved from emergency response to include those designed to establish facts for later prosecution. *Id.* at 40. The testimonial statements included that the perpetrator was on probation, the operator's question about the cause of probation, and the declarant's response. *Id.* at 31, 40. The declarant also stated that she was financially dependent upon the perpetrator and did not want him to go to jail, to which the operator responded with her belief that the perpetrator should go to jail for hitting the declarant. *Id.* All of those statements, the court concluded, as well as a later statement the declarant made to an investigating officer that the perpetrator had struck her eye, were inadmissible at trial. *Id.* at 40-41.

The interrogation at issue in this case is more similar to the latter half of the 9-1-1 call in *Camarena* and the circumstances of the interrogation in *Hammon* than the interrogations in *Davis* and *Bryant*. In *Davis*, the perpetrator had fled during the call and could have returned to further threaten the declarant at any moment. In *Bryant*, the perpetrator's location was unknown, and officers did not know

if he was a threat to their own safety or that of the public. Further, in *Bryant*, the declarant-victim was in an extreme state of physical emergency such that he would have had no purpose beyond the emergency response. *Camarena* suggests that it is not merely the existence of an ongoing emergency—the facts in that case were narrowly distinguishable from the facts in *Davis*—but also, importantly, the nature of the statements made by the declarant that determine whether statements are testimonial.

In reviewing the trial court's decision, we first examine the circumstances in which the interrogation occurred, as that context guides our understanding of the statements that were made. *Bryant*, 562 US at 360, 371 ("[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved *** but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.").

In the case before us, the trial court determined that circumstances suggested that, from Slaven and Kringhelde's perspective, the emergency was ongoing. When Kringhelde arrived, Slaven was hiding behind a tree on the golf course at the edge of the backyard, still on the phone with the 9-1-1 operator, and shaken from having just witnessed a murder. For her part, Kringhelde was not privy to the status of the emergency response or investigation, the whereabouts of the defendant, or the parties involved. The trial court also based its ruling, in part, on the fact that the interaction was informal and brief, taking place in the backyard for about five minutes. While acknowledging that some of Slaven's statements were "borderline historical," the trial court concluded that they were "part of the ongoing scenario."

We agree that those facts suggest that reasonable people in both Slaven and Kringhelde's position would have understood there to be an ongoing emergency, and the interrogation occurred with the degree of informality and temporal proximity to the emergency event that would suggest a primary purpose of facilitating an emergency response.[2]

_____

[2] We note that the parties dispute whether, when conducting the ongoing-emergency analysis, we should consider the knowledge that the particular

That context frames the more difficult question of whether the elicited statements Slaven made to Kringhelde were "necessary to resolve the present emergency." *Camarena*, 344 Or at 39; *see also State v. Rafeh*, 361 Or 423, 433, 393 P3d 1155 (2017) ("[W]hether an ongoing emergency exists is simply one factor *** that informs the ultimate inquiry regarding the primary purpose of the interrogation."). To the single question of "what happened or what's going on," Slaven gave a detailed account of events, including statements of intent that defendant had made to Slaven earlier in the evening and other inculpatory statements made just before committing the act. For example, she said that while the two were out picking up fast food defendant told her that he planned to act like he was going to have sex with G and then kill him. She further stated that defendant, just before killing G, had walked into the kitchen and asked her for rubber gloves so that he didn't have to touch him.

As in *Camarena*, we conclude that some of the statements Slaven made to Kringhelde were nontestimonial while others were testimonial. Identification of defendant and descriptions of the murder itself—Slaven having heard crashing sounds coming from G's room; having heard cries for help coming from the room; having witnessed defendant kill G using a bag or a rope; and defendant asking her to help dump the body, which caused Slaven to flee to the golf course—were nontestimonial, as they are the type of statements frequently elicited to aid in emergency response. In any event, many of those details were provided by Slaven to her husband and to the 9-1-1 operator, both of which the trial court allowed as nontestimonial excited utterances that are not being challenged. However, Slaven's statements regarding her conversation with defendant in the car in which he stated that he was going to pretend to have sex with G and then kill him; her statement that she and defendant had been drinking earlier in the evening; her observations of defendant and G going in and out of the bathroom as though they were going to have a sexual encounter;

---

officer possesses about the state of the investigation or, rather, the knowledge that the entire law enforcement response team possesses. We need not decide that question to reach our conclusion that the statements made by declarant were testimonial and, therefore, do not decide it.

defendant's request for gloves in the kitchen so that he didn't have to touch G, and any other statements that were focused on establishing facts in the past that were unnecessary to resolve the perceived ongoing emergency were testimonial for purposes of the Confrontation Clause. Therefore, the trial court erred in denying defendant's motion to suppress those statements. We need not decide whether the error was harmless given the procedural posture; when a defendant reserves the right to appeal adverse pretrial motions as part of a conditional guilty plea under ORS 135.335(3), any error found provides the defendant with an opportunity to decide whether to withdraw their guilty plea and proceed to trial.

B.  *Article I, Section 12, and the Fifth Amendment*

In his first assignment of error, defendant argues that intoxication prevented him from knowingly, intelligently, and voluntarily waiving his right against compelled self-incrimination under Article I, section 12, of the Oregon Constitution, as well as the Fifth Amendment to the United States Constitution. Pursuant to the Fifth Amendment, a defendant's right against compelled self-incrimination attaches when they are in inherently coercive circumstances akin to police custody. *Stansbury v. California*, 511 US 318, 322, 114 S Ct 1526, 128 L Ed 2d 293 (1994). The Article I, section 12, right similarly provides protection to defendants who are in custody or "compelling circumstances." *Reed*, 371 Or 478, 484, 538 P3d 195 (2023). We begin with the protections provided by Article I, section 12.

Article I, section 12, provides that "[n]o person shall *** be compelled in any criminal prosecution to testify against himself." To protect the right against compelled self-incrimination, law enforcement must give *Miranda* warnings to a person who is either in "full custody" or in circumstances that "create a setting which judges would and officers should recognize to be 'compelling'"—that is, a setting containing "the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *State v. Roble-Baker*, 340 Or 631, 638, 641, 136 P3d 22 (2006); *see also Miranda v. Arizona*, 384 US 436, 467, 86 S Ct 1602, 16 L Ed 2d 694 (1966) (explaining that *Miranda* warnings were intended to counteract the "inherently compelling

pressures" of "in-custody interrogations"); *State v. Vondehn*, 348 Or 462, 474, 236 P3d 691 (2010) (describing the same intention under the Oregon Constitution). Therefore, when reviewing whether a defendant's Article I, section 12, rights were violated, courts first determine whether the defendant was in custody or in compelling circumstances such that officers were required to give *Miranda* warnings. *Reed*, 371 Or at 488; *Roble-Baker*, 340 Or at 639. If officers were required to give *Miranda* warnings and did so, any waiver of those rights by a defendant must be knowing, intelligent, and voluntary under the totality of the circumstances. *State v. Nichols*, 361 Or 101, 107, 390 P3d 1001 (2017).

With deference to the trial court's findings of historical facts, we review for legal error both whether circumstances were compelling and, if so, whether any waiver of the rights was knowing, intelligent, and voluntary. *Reed*, 371 Or at 488; *State v. Ward*, 367 Or 188, 200, 475 P3d 420 (2020).

In this case, the trial court concluded that defendant was not in custody or compelling circumstances when he spoke to Mitchell in the driveway. Accordingly, the trial court concluded that Mitchell was not required to give *Miranda* warnings—*i.e.*, that no waiver was necessary. *See State ex rel City of Pendleton v. Woodell*, 338 Or App 85, 90, 565 P3d 80, *rev den*, 373 Or 815 (2025) ("[A]n officer is not required to obtain a waiver of the rights enumerated in *Miranda* warnings from a defendant who is not in custody or compelling circumstances."); *Reed*, 371 Or at 488 ("The state bears the burden of proving that a defendant's unwarned statements were made under circumstances that were not compelling," such that the *Miranda* warnings were not required.). Independently, the trial court concluded that, even if Mitchell was required to give *Miranda* warnings, defendant voluntarily waived his rights.

On appeal, defendant argues only that any waiver of his *Miranda* rights was involuntary, without making any argument that the trial court was wrong to conclude that the circumstances were not compelling such that the right against compelled self-incrimination never attached. Because he does not challenge the trial court's determination

that *Miranda* warnings were not required, we affirm the trial court's denial of defendant's motion to suppress his own statements. *State v. Nunes*, 295 Or App 91, 101, 433 P3d 374 (2018), *rev den*, 364 Or 849 (2019) (affirming when the defendant failed to challenge an independent, sufficient basis for the trial court's ruling).

In a post-argument memorandum of additional authorities, defendant also argues that, based on the Supreme Court's recent decision in *Miller II*, even when circumstances are not compelling such that *Miranda* warnings and a knowing, intelligent, and voluntary waiver of *Miranda* rights are not required, any statements he made to Mitchell must have been voluntary. 375 Or at 190. In that case, the defendant had argued that circumstances were compelling and that her waiver of *Miranda* rights had not been knowing, intelligent, and voluntary. 336 Or App 606, 607, 561 P3d 675 (2024) (*Miller I*). We determined that the record supported the trial court's conclusion that the circumstances were not compelling, which "rendered the corollary requirement to obtain a valid waiver of those rights unnecessary," and affirmed the ruling on that basis. *Id*. at 609. On review, without disagreeing with our assessment, the Supreme Court explained that, even when circumstances are not compelling such that *Miranda* warnings are not required and the state is not required to establish a knowing, intelligent, and voluntary waiver of *Miranda* rights, "the state must still establish that [the] defendant's statements made [to law enforcement officers] were voluntary." *Miller II*, 375 Or at 183-84, 190 ("Whether a person makes statements to the police voluntarily is a separate question from whether the police were required to inform a suspect of their *Miranda* rights or obtain a knowing and voluntary waiver of those rights.").

Because the question of whether a person makes statements to the police voluntarily is separate from the *Miranda* question and because that issue was not raised in defendant's opening brief or litigated below, we decline to rely on the factual record before us to decide in the first instance whether defendant's statements to Mitchell were themselves voluntary. On remand, should defendant choose

to rescind his conditional plea, the parties can litigate the issue of whether defendant's statements were voluntary.

### III.   CONCLUSION

Concluding that many of Slaven's statements to Kringhelde were testimonial, we reverse the trial court's denial of defendant's motion to exclude those statements. Under ORS 135.335(3), we reverse and remand the judgment of conviction to give defendant an opportunity to decide whether to withdraw his guilty plea. *State v. Leach*, 294 Or App 639, 646, 432 P3d 310 (2018). We affirm the denial of defendant's motion to suppress on *Miranda* grounds, but we note that *Miller II* requires an assessment of whether defendant's statements to Mitchell were voluntary. Should defendant choose to withdraw his guilty plea, the parties will have an opportunity to litigate and create a factual record on the issue of whether defendant's statements to Mitchell were voluntary and, if necessary, to address the issues raised in defendant's third assignment of error.

Reversed and remanded.